**UNITED STATES of America,
Appellee,**

v.

**Dwight L. LIEB, Individually and d/b/a
Antonian Apartments, Appellant.**

**No. 5–1.**

Temporary Emergency Court of Appeals.
June 16, 1972.

Seagal V. Wheatley, San Antonio, Tex. (Oppenheimer, Rosenberg & Kelleher, Inc., H. Gordon Davis and Harvey L. Hardy, San Antonio, Tex., on the brief) for appellant.

C. Max Vassanelli, Washington, D. C. (L. Patrick Gray III, Washington, D. C., William S. Sessions, San Antonio, Tex., William E. Nelson and Stanley D. Rose, Washington, D. C., on the brief) for appellee.

Before VAN OOSTERHOUT, ESTES and JOHNSON, Judges.

ESTES, Judge.

Dwight L. Lieb appeals from an order of the District Court granting the United States an injunction against him for violating Executive Order 11615, and the regulations promulgated pursuant thereto, which imposed a 90-day stabilization period on prices, rents, wages, and salaries, effective August 15, 1971.

Defendant Lieb owns the Antonian Apartments, a 104-unit complex comprising four classes of apartments (classes A, B, C, and D) in San Antonio, Texas. Each apartment within a class is identical to the others except for the color scheme. On April 1, 1971, Lieb increased the monthly rentals by $10.00 for all subsequently rented apartments, but did not increase the rent for apartments rented before that date. On July 28, 1971, and again on August 26, 1971, tenants whose rent had not previously been increased, "old tenants," were informed by letter that their monthly rental rates would be increased $10.00 on September 1, 1971, in order to bring their rents in line with the higher rents charged "new tenants." The increase was effective 15 days after commence-

ment of the stabilization, "wage-price freeze," period ordered by the President pursuant to the Economic Stabilization Act of 1970. Lieb sought no exemption, exception or adjustment, within the purview of the existing regulations. On August 14, 1971, the day preceding the freeze, Lieb rented more than 10 percent of each class of apartments at the increased rates.

After receiving complaints from old tenants about this rent increase, Internal Revenue Agent Russell Johnson met with Lieb, informed him that he was in violation of the Executive Order and the implementing regulations, and sought his voluntary withdrawal of the September 1 rent increases. Lieb refused on the basis of a differing interpretation of limitations imposed on rent increases by the Executive Order and the implementing regulations. Consequently the United States brought this action for injunctive relief to prohibit Lieb from increasing the rent for any apartment during the wage-price freeze and to require Lieb to return any increase in rent collected from old tenants during that period. After a full hearing on October 4, 1971, the District Court found for the United States and granted the relief sought.

The Economic Stabilization Act of 1970,[1] as amended as of August 15, 1971, provides in part:

"§ 202. Presidential authority

"(a) The President is authorized to issue such orders and regulations as he may deem appropriate to stabilize prices, rents, wages, and salaries at levels not less than those prevailing on May 25, 1970. Such orders and regulations may provide for the making of such adjustments as may be necessary to prevent gross inequities."

"§ 203. Delegation

"The President may delegate the performance of any function under this title to such officers, depart-

ments, and agencies of the United States as he may deem appropriate."

"§ 205. Injunctions

"Whenever it appears to any agency of the United States, authorized by the President to exercise the authority contained in this section to enforce orders and regulations issued under this title, that any person has engaged, is engaged, or is about to engage in any acts or practices constituting a violation of any regulation or order under this title, it may in its discretion bring an action, in the proper district court of the United States . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. Upon application of the agency, any such court may also issue mandatory injunctions commanding any person to comply with any regulation or order under this title."

Executive Order 11615 [2] reads in pertinent part:

"Section 1. (a) Prices, rents, wages and salaries shal be stabilized for a period of 90 days from the date hereof at levels not greater than the highest of those pertaining to a substantial volume of actual transactions by each individual, business, firm or other entity of any kind during the 30-day period ending August 14, 1971, for like or similar commodities or services. If no transactions occurred in that period, the ceiling will be the highest price, rent, salary or wage in the nearest preceding 30-day period in which transactions did occur. No person shall charge, assess, or receive, directly or indirectly in any transaction prices or rents in any form higher than those permitted hereunder, and no person shall, directly or indirectly, pay or agree to pay in any transaction wages or salaries in

1. P.L. 91–379, 84 Stat. 796 (1970) ; P.L. 91–588, 84 Stat. 1468 (1970) ; P.L. 92–8, 85 Stat. 13 (1971) ; P.L. 92–15, 85 Stat. 38 (1971) ; subsequently amended P.L. 92–210, 85 Stat. 743 (1971). The amend-

ment by Public Law 92–210 has no bearing on this case.

2. 3 C.F.R. 199 (1971 Comp.) ; 36 Fed. Reg. 15127 (August 17, 1971) ; CCH Economic Controls ¶ 8005.

any form, or to use any means to obtain payment of wages and salaries in any form, higher than those permitted hereunder, whether by retroactive increase or otherwise."

"Sec. 2. (a) There is hereby established the Cost of Living Council which shall act as an agency of the United States and which is hereinafter referred to as the Council."

"Sec. 3. (a) Except as otherwise provided herein, there are hereby delegated to the Council all of the powers conferred on the President by the Economic Stabilization Act of 1970."

"Sec. 4. (a) The Council, in carrying out the provisions of this Order, may (i) prescribe definitions for any terms used herein, (ii) make exceptions or grant exemptions, (iii) issue regulations and orders, and (iv) take such other actions as it determines to be necessary and appropriate to carry out the purposes of this Order.

"(b) The Council may redelegate to any agency, instrumentality or official of the United States any authority under this Order, and may, in administering this Order, utilize the services of any other agencies, Federal or State, as may be available and appropriate."

"Sec. 7. (b) The Council shall in its discretion request the Department of Justice to bring actions for injunctions authorized under Section 205 of the Economic Stabilization Act of 1970 whenever it appears to the Council that any person has engaged, is engaged, or is about to engage in any acts or practices constituting a violation of any regulation or order issued pursuant to this Order."

On August 17, 1971, the Cost of Living Council (sometimes referred to as the Council), in its Order No. 1,[3] delegated to the Director, Office of Emergency Preparedness (sometimes referred to as OEP), the authority vested in the Council by Sections 4(a), 5 and 7 of Executive Order 11615.

The Director of OEP issued Economic Stabilization Regulation 1[4] (sometimes referred to as ES Reg. 1), on August 20, 1971; the pertinent parts are, as follows:

"Section 1 Purpose.

"The purpose of this regulation is to promulgate initial guidance and procedures for implementing the stabilization of prices, rents, wages, and salaries in accordance with the provisions of Executive Order No. 11615 of August 15, 1971 . . . . ."

"Sec. 2 Prohibition."

"(c) No person shall offer, demand, or receive any rent higher than the ceiling rent prevailing for the same or comparable property for a substantial number of actual transactions during the base period.

"Sec. 3 Guidance."

"(b) *Rents.* The ceiling rent for commercial property, housing accommodations, . . . and other establishments, together with all privileges, services, furnishings, furniture, equipment, facilities, improvements, and any other privileges connected with the use thereof shall be no greater than the highest rent charged for the same property during the base period. If the property was not rented during the base period, the ceiling price shall be no higher than the highest rent charged during the nearest preceding 30-day period prior to the base period. If the property was never previously rented, the ceiling rent shall be no higher than the ceiling rent charged for similar or comparable property in the locality or area."

"Sec. 6 Definitions.

"(a) For purposes of this regulation, the term—

"(1) 'Base period'—for any commodity, service, rent, salary or wage

3. 36 Fed.Reg. 16215 (August 20, 1971); CCH Economic Controls ¶ 8379.

4. 32A C.F.R. 35 (1972); 36 Fed.Reg. 16515 (August 21, 1971); CCH Economic Stabilization ¶¶ 8241–83.

includes the period from July 16, 1971, through August 14, 1971, and, in the event that no transaction occurred in the latter period, the nearest preceding 30-day period in which a transaction did occur: *Provided, however,* That prices, rents, wages and salaries need not be established at levels less than those prevailing on May 25, 1970."

"(13) 'Substantial volume of transactions'—is determined as follows: The ceiling price is the price at or above which 10 percent of the actual transactions during the base period were made . . . ."

"Sec. 11 Information."

"(b) OEP shall from time to time issue circulars containing implementing instructional material which shall be set forth in Appendix I to this regulation." [Added by Amendment 1, August 23, 1971]

OEP issued Economic Stabilization Circular No. 101 [5] (hereinafter referred to as "Circular No. 101"), on September 20, 1971, "for general information only" regarding ES Reg. 1. The pertinent portions of Circular No. 101 are, as follows:

"600. *Rent guidelines.*

"601. *General.* (1) The ceiling rent for . . . housing accommodations . . . and other establishments . . . shall be no greater than the highest rent charged for the same property during the base period. If the property was not rented during the base period, the ceiling price shall be no higher than the highest rent charged during the nearest preceding 30-day period prior to the base period. If the property was never previously rented, the ceiling rent shall be no higher than the ceiling rent charged for similar or comparable property in the locality or area.

"602. *Specific.* Based on the general guidance provided above, the following specific guidance is provided:

"(1) Apartment house and other rent fees are included in the 90-day freeze."

"(4) If a tenant's lease expires during the freeze, his rent cannot be raised to the level which is being paid by new tenants in similar units."

A three-judge court, in a discriminating opinion by Circuit Judge Leventhal, upheld the constitutionality of the Economic Stabilization Act of 1970 and Executive Order 11615, in Amalgamated Meat Cutters & Butcher Workmen of North America v. Connally, 337 F.Supp. 737 (D.D.C.1971). Defendant does not question this decision.

Lieb's major contention is that Executive Order 11615 permits a landlord to bring rents up to a ceiling established by the highest rent pertaining to a "substantial volume [10%] of actual transactions" [6] during the base period, from July 16, 1971, through August 14, 1971.[7] This contention is based upon the language of Section 1(a) of the Executive Order and Section 2(c) of ES Reg. 1. If the substantial volume of actual transactions test applies to apartment house rents, the defendant had rented a sufficient percentage of his apartment units at the increased April 1, 1971 rates to establish those rates as a ceiling rent for all the units. However, the government cites Section 3(b) of ES Reg. 1 and paragraphs 601 and 602(1) and (4) of Circular No. 101 as precluding the use of the substantial volume of actual transactions provisions with respect to units with a prior rental history and, instead, basing the rent ceiling for each particular rental unit upon its own rent received for the base period. Lieb contends that OEP lacked the authority to deny the use of the substantial volume of actual transactions provisions in determining a rent ceiling,

5. ES Reg. 1, Appendix I, 32A C.F.R. 39 (1972) ; CCH Economic Stabilization ¶¶ 8285–96.

6. ES Reg. 1, Sec. 6(a) (13), *supra.*

7. *Id.* Sec. 6(a) (1).

and that the provisions cited by the government are invalid as being inconsistent with Executive Order 11615. The flaw in Lieb's contention is that it ignores the further provisions of Executive Order 11615 delegating "to the Council all of the powers conferred on the President by the Economic Stabilization Act of 1970." [8] Specifically, the Council "may (i) prescribe definitions for any terms herein, (ii) make exceptions or grant exemptions, (iii) issue regulations and orders, and (iv) take such other action as it determines to be necessary and appropriate to carry out the purposes of this Order." [9] The President has made the broadest delegation of power to the Council, allowing it to use its own discretion as to the best means of achieving the purposes of the Executive Order, which are "to stabilize the economy, reduce inflation, and minimize unemployment [by stabilizing] prices, rents, wages, and salaries." [10] The Council, in turn, delegated the specific powers quoted above to the Director of OEP.

Sec. 2(c) of ES Reg. 1, which is essentially a rewording of Sec. 1(a) of the Executive Order, is a general statement of the overall policy to stabilize rents. Sec. 3(b) of ES Reg. 1 provides a detailed explanation of this policy. A close reading of these sections reveals that a ceiling rent based upon a substantial volume of transactions during the base period is part of the policy, but is limited to rental units without a prior rent history. Units that have been previously rented may not have their rents increased on the basis of the rental history of other rental units. Obviously, the OEP has not abandoned the general policy announced in Executive Order 11615, but only refined it for implementation, in accordance with its delegated authority. OEP had not only the authority but the duty to "take such . . . actions as it determines to be necessary and appropriate to carry out

the purposes of" [11] Executive Order 11615. The method OEP has selected provides the most accurate measure of the highest rent received during the base period for units with a rental history. In contrast, commodities and services, like units without a prior rental history, whose prices fluctuated during the base period had no price per the same unit available to determine the price level during the base period, and so OEP justifiably stabilized prices on the basis of the highest price per similar unit in a substantial volume of actual transactions. Other justifiable reasons for OEP's selecting the individual unit rental history basis might include: (1) the prevention of using the rent of one unit as a lever to increase the rent of another unit and (2) the simplification of administration by reducing disputes over comparability of units. Although Sec. 3(b) of ES Reg. 1 and the information contained in Circular No. 101 are narrower than the generalized statement in the Executive Order, they are not inconsistent with the provisions of the Executive Order; nor has OEP exceeded its authority in issuing these regulations and circulars. United States v. Intone Corp., 334 F.Supp. 905 (ND.Tex.1971); Huber Investment Corp. v. Connally, 337 F.Supp. 507 (S.D.Ohio 1972).

In oral argument before this Court, Lieb first advanced the unrealistic contention that the term "same property" used in ES Reg. 1 Sec. 3(b) meant like or identical rather than the same apartment unit. In interpreting the specific wording of the regulation, the Court must place great weight upon an agency's interpretation of its own regulation. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413–414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). OEP's interpretation of "same property" is clearly shown in paragraph 602(4) of Circular No. 101: "If a tenant's lease expires during the freeze, his rent cannot be raised to the level which is being paid

---

8. Executive Order 11615, Sec. 3(a), *supra.*

9. *Id.* Sec. 4(a).

10. *Id.*

11. *Id.* Sec. 4(a) (iv).

by new tenants in similar units." Lieb argues that the information provided in Circular No. 101 should not be used in his case, since Circular 101 was published the day before the United States brought this suit against him in the District Court. However, Circular No. 101 was a compilation of guidelines previously set forth, and this particular guideline had remained unchanged since it was initially issued, on August 23, 1971, in Economic Stabilization Circular No. 1 [12] (which was subsequently superseded by Circular No. 101). The same information was also provided in Cost of Living Council Question and Answer List No. 5, published August 24, 1971,[13] and in Cost of Living Council Summary No. 1, dated August 29, 1971.[14] Thus, the official interpretation had been published prior to Lieb's September 1 rent increase, not just prior to the filing of this suit. Indeed, the record shows that Agent Johnson, in his discussions with Lieb, produced similar illustrations in an effort to obtain the defendant's voluntary cooperation. There can be no doubt that Lieb had known before the commencement of the suit that the implementing agencies interpreted the regulation to mean that each rental unit stood on its previous rental history. The weakness in Lieb's interpretation of "same property" is indicated by the late date at which he advances this argument.

■ Lieb's second significant contention is that he was denied due process because he was unable to obtain an administrative hearing upon his claim that ES Reg. 1, Sec. 3(b) exceeded the authority delegated by Executive Order 11615.

In announcing "a freeze on all prices and wages throughout the United States for a period of 90 days" [15] in his address to the nation delivered August 15, 1971, the President emphasized that this program was temporary and would not be accompanied by the establishment of a huge price control bureaucracy. If OEP had been required to hold administrative hearings on the advisability of the regulations and interpretations it adopted or planned to adopt, the delays encountered by such hearings would have destroyed the program scheduled to be in effect for only 90 days. Procedures were set up for handling requests for exemptions or exceptions, and Lieb was advised of these procedures. He elected to forego the administrative procedures available to him. Furthermore, the Economic Stabilization Act, Sec. 205, requires that an application for injunction on the part of any agency of the Government must be brought in the proper United States District Court, thus assuring that any alleged violator of the Act or Executive Order will be afforded a hearing before his acts or practices may be enjoined. Having obtained a full hearing before the District Court before the injunction was issued, Lieb has been afforded due process.

■ The Supreme Court, in Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971), holds that federal statutes are consistent with the due process clause of the Fifth Amendment if they meet the rational basis test enunciated in Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), as follows:

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' . . . 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it

12. 36 Fed.Reg. 16586, 16588 (August 24, 1971).

13. CCH Economic Controls ¶ 8214.

14. *Id.* ¶ 8322.82.

15. *Id.* ¶ 8365.

may be, and unscientific.' . . . 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' " It is apparent that a reasonable basis exists for the orders and actions of the Executive branch here attacked.

██ Defendant also raised the issue that the government's complaint did not affirmatively allege jurisdiction for failure to state that an agency authorized to bring the action under § 205 of the Economic Stabilization Act had brought the suit. The action was brought in the name of the United States by the Department of Justice upon the request of OEP.[16] The United States was the real party in interest, and the District Court had jurisdiction of the case. 28 U.S.C. § 1345. Indeed, in oral argument to this Court, defendant's counsel admitted that this point was really a part of his complaint about the overall actions of the administrative agencies in depriving Lieb of the substantial volume of actual transactions test.

██ Defendant's last point is that the evidence was insufficient to establish that he violated the Economic Stabilization Act of 1970, Executive Order 11615, or ES Reg. 1. It is undisputed that Lieb increased the rents of 58 apartments above the permitted ceiling rent on September 1, 1971. The evidence clearly supports the determination that Lieb violated the Economic Stabilization Act of 1970, Executive Order 11615, and ES Reg. 1 promulgated thereunder.

The judgment of the District Court is right, and it is affirmed.

16. Executive Order 11615, Sec. 4(b) & Sec. 7(b), *supra*; Cost of Living Council Order No. 1, *supra*.