**AMERICAN NURSING HOME ASSOCIATION, Plaintiff,**

v.

**The COST OF LIVING COUNCIL et al., Defendants.**

**Civ. A. No. 1773-73.**

United States District Court, District of Columbia.

Dec. 5, 1973.

Thomas C. Fox, Washington, D. C., for plaintiff.

James Elkins, Atty., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM

GASCH, District Judge.

This cause is before the Court on plaintiff's motion for a preliminary injunction and a declaratory judgment and defendants' motion to dismiss.

### I. Background.

Principally, plaintiff seeks to enjoin the implementation and enforcement of 6 C.F.R. § 300.18 of the Cost of Living Council (hereinafter referred to as COLC) regulatory scheme applicable to nursing homes.[1] This regulation gener-

---

1. Since the evolution of these regulations is rather complicated, the Court will for the sake of clarity briefly describe the authority which is at issue in this suit. Pursuant to section 203 of the Economic Stabilization Act of 1970 (Public Law 91–379, 84 Stat. 799, August 15, 1970), as amended (Public Law 92–210, 85 Stat. 743, December 22, 1971, and Public Law 93–28, 87 Stat. 27, April 30, 1973), the President promulgated

ally limits price increases to nursing homes to those which can be justified by cost increases,. and then only to the extent that the price increases do not increase aggregate annual revenues of the preceding year by more than six percent.

Plaintiff, the American Nursing Home Association (hereinafter referred to as ANHA) is a nonprofit corporation and the nation's largest nursing home association with 7,000 members representing 500,000 patient beds. The prime objection of ANHA to the COLC regulatory scheme is that it treats all Medicare and Medicaid reimbursement as a price thus prohibiting the homes from receiving any reimbursement under these programs if that reimbursement, albeit approved by State and Federal governments, increases aggregate annual revenues of the preceding year by more than the six percent ceiling allowed by the COLC unless an exception is granted pursuant to 6 C.F.R. § 300.-18(c)(2).

Executive Order 11615 which, *inter alia*, established the COLC as the agency with the primary responsibility for administering the Economic Stabilization Program. Under Executive Order 11627 (October 15, 1971) and pursuant to section 203 of the Act, the COLC was continued and given further authority to stabilize prices, rents, wages, and salaries.

On December 29, 1971, the Price Commission issued regulations covering health care providers. These regulations, 6 C.F.R. § 300.18 and § 300.19, are the provisions challenged by the plaintiff in this suit. However, due to the creation of Phase IV it is necessary to further outline the status of these regulations.

By Executive Order 11695, promulgated on January 12, 1973, the President delegated to the Chairman of COLC all powers conferred upon him by the Act, including the power to make the determinations and take the actions required or permitted by the Act.

On January 12, 1973, Part 300 of the Price Commission regulations was superseded by COLC regulation, Part 130. Institutional providers of health services, including plaintiff, however, remained subject to virtually the same mandatory controls provided for in § 300.18. (§ 130.61, Cost of Living Council Regulations, 38 Fed.Reg. 1479, January 12, 1973).

A. Medicare.

Title XVIII of the Social Security Act, commonly referred to as "Medicare", establishes a Federal health insurance program which, under the strict and careful supervision of the Secretary of Health, Education, and Welfare, provides medical care for the aged. Under Medicare, posthospital extended care is available to an eligible beneficiary in a skilled nursing facility. To participate in this program as a skilled nursing facility, a nursing home must be certified by the state agency, an administrator of the program along with a private organization known as the "fiscal intermediary," as being in compliance with various health, safety, and environmental standards, and have executed a provider agreement with the Secretary of HEW.

Payments to skilled nursing homes for services under Title XVIII are to be the reasonable cost of such services determined in accordance with 42 U.S.C. §§ 1395f and 1395x(v), as amended by the Social Security amendments of 1972.[2]

In Phase IV the COLC is continuing the Phase II and III rules (6 C.F.R. §§ 300.18 and 300.19) applicable to institutional and non-institutional providers of health services (38 Fed.Reg. 21978, August 15, 1973), but the rules have been removed from COLC regulation Part 130 and restated in Part 150 without substantive change.

2. Title 42 U.S.C. § 1395f(b),· as amended, provides in relevant part:

(b) The amount paid to any provider of services with respect to services for which payment may be made under this part shall, subject to the provisions of section 1395e, [42 U.S.C. § 1395e] be—

(1) the lesser of (A) the reasonable cost of such services, as determined under section 1395x(v) [42 U.S.C. § 1395x (v)] or (B) the customary charges with respect to such services  .  .  . .

Title 42 U.S.C. § 1395x(v), as amended, reads as follows:

(v)(1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used  .  .  .  .

In determining reasonable cost of reimbursement it is significant that the government stringently examines the nursing home expenses. Providers of these services are required to prepare cost analysis reports annually on prescribed forms and the "fiscal intermediary" performs a careful examination of financial and statistical records of the nursing homes.[3] In addition, to promote the most efficient use of available beds, patient services, and professional staff time, the law requires the nursing home to have a utilization review plan. The utilization plan provides for review by an outside group to assure maintenance of high quality patient care and the effective use of facilities (42 U.S.C. § 1395x(k)).[4] One final control shows just how comprehensively the government scrutinizes the factors of "reasonable cost." Under the prudent buyer/operator concept, 20 C.F.R. § 405.451, the provider is required to take advantage of discounts, bulk buying, and other group practices which will insure lower costs. If a provider fails to take advantage of these practices, the amount of his allowable cost may be reduced accordingly.[5]

### B. Medicaid.

"Medicaid," Title XIX of the Social Security Act, is a cooperative Federal-State program which was enacted for the purpose of enabling states to furnish medical assistance for the aged, blind, and disabled, as well as for families with dependent children and other individuals whose economic resources are insufficient to meet the costs of necessary medical services. In order to participate, a state submits to the Secretary of HEW a plan for medical assistance which comports with certain statutory requirements, one of which is to provide skilled nursing home services for eligible beneficiaries.

Federal matching funds are used to finance state plans for medical assistance. Payments under such a plan are disbursed by an appropriate state agency to nursing homes and other providers of medical assistance.

The precise amount of such payments is established by the state, subject only to a ceiling imposed by 42 U.S.C. § 1396a(a)(30), which provides that a state plan must make provision to ensure that payments for medical care and services "are not in excess of reasonable charges consistent with efficiency, economy, and quality of care." In implementing 42 U.S.C. § 1396a(a)(30), the Secretary of HEW promulgated regulations establishing that the upper limits on state payments with regard to various types of medical services under Medicaid (45 C.F.R. § 250.30) cannot exceed the reasonable cost reimbursement made by the Secretary to such facilities for comparable medical services under Medicare. (45 C.F.R. § 250.30(b)(3)(ii).)[6] Section 1396a(a)(27) of 42 United States Code requires that states enter into written agreements with every person or institution providing services under the state plan. Under these agreements the state agrees to pay the provider for skilled nursing home services, and the provider, in accordance with the method of reimbursement contained in the state plan, agrees to accept this as payment in full for the care of the patient. In a number of states, it was found by Congress that many rates were less than the providers' costs for the patient.[7] To correct this disparity,

---

3. Affidavit of Robert J. Myers, Professor of Actuarial Science, Temple University, at 9.

4. *Id.* at 9–10. *See* 20 C.F.R. § 405.1137, Title XIX (Medicaid), 42 U.S.C. § 1396a(a) (30).

5. *Id.* at 10. See Provider Reimbursement Manual § 2102–1 and § 2103.

6. Section 233 of Pub.L. 92–603 (Social Security Amendments of 1972), now provides for accounting periods after December, 1972, that reimbursement for services under Medicaid and Medicare cannot exceed the lesser of reasonable costs determined under Medicare, or the customary charges to the public.

7. S.Rep.No.92–1230, 92nd Cong., 2nd Sess., 287 (1972).

many states have raised their reimbursement rates, but are unable to pass along these increases due to COLC regulations at issue in this case.[8]

## II. Motion to Dismiss.

Before the Court addresses plaintiff's prayer for a preliminary injunction and declaratory judgment, it is appropriate first to examine defendants' argument that for various reasons this Court lacks jurisdiction to grant the relief requested.

Defendants' first contention in this regard is that plaintiff has failed to present a justiciable controversy between the parties before the Court. Citing the classic case of Aetna Life Insurance Company v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937), defendants argue that this controversy is not sufficiently definite and concrete to be decided through a decree of a conclusive character. The basis of this argument is that plaintiff represents 7,000 individual nursing homes of different sizes, financial conditions, and different degrees of operational effectiveness and participation in Medicare and Medicaid. Due to this varied standing of each home vis-a-vis the COLC regulations, defendants assert that this Court cannot adequately define the legal question for determination.

■ The Court disagrees with this reasoning. First, plaintiff seeks a declaratory judgment that the entire scheme of regulation is arbitrary and capricious as well as in conflict with Congress' clear direction as related to reimbursement of nursing homes for expenditures under Medicare and Medicaid. There is more than adequate documentation in the record to show that this scheme will have a generally detrimental effect on the growth of the entire nursing home industry. This fact is admitted in an option paper prepared by defendants' own staff where it is stated:

> If a nursing home is viewed as a less expensive alternative to acute care institutionalization and is therefore, to be encouraged, the impact of the Economic Stabilization on the growth of this sector thus far would appear to be deleterious.[9]

Defendants' reliance on National Education Association of The United States v. Cost of Living Council, Civ. Action No. 1946–71 (D.C.D.C., December 7, 1971), is misplaced. In that case the Court was called upon to render an opinion as to whether certain classes of teachers' contracts, with an infinite variety of dissimilarities, fell within the Economic Stabilization Regulation No. 1, 36 Fed. Reg. 16515. This Court, on the other hand, is principally asked only to review the regulation in light of its contradiction of the Social Security Act mandate in connection with Medicare and Medicaid and its effect generally on the nursing home industry for which there is substantial documentation. Therefore, the Court can adequately rule on this substantive question.

■ Defendants' second argument for dismissal is that administrative remedies have not been exhausted by plaintiff's individual nursing homes. Significantly, however, plaintiff was provided under 6 C.F.R. § 155.41 et seq., 38 Fed. Reg. 21985 (Aug. 15, 1973) with the right to seek an industry exemption from these regulations. Plaintiff availed itself of this opportunity on March 30, 1973, by filing for such an exemption under the then existing Phase III regulations.[10] To date, this request

---

8. Affidavit of James J. Hiniker, Deputy Commissioner of Minnesota Department of Public Welfare, September 11, 1973, at 5. *See also* Affidavit of John E. Richard, Vice President of the Oregon Health Care Association. In Oregon the COLC refused to allow Oregon more than 7.6% of a 14.4% rate increase passed by the Oregon legislature.

9. Memorandum for Members -of the Ad Hoc Committee from Executive Director, Health, August 21, 1973, at 2 (hereinafter referred to as COLC Option Paper).

10. Although it is not necessary to directly rule that defendants' inaction on plaintiff's application for industry exemption is in fact

is undecided. It appears to this Court that defendants' argument is inherently inconsistent. It argues on the one hand that plaintiff can avail itself of industry exemption and on the other, that each home must exhaust its administrative remedies. Perhaps more significant is the fact that plaintiff is calling upon this Court to declare this regulatory scheme in conflict with the dictates of Congress as reflected in the Social Security Act. The Court can interpret and rule on this conflict between regulation and statute as cogently as the agency and therefore the Court does not feel constrained to dismiss the complaint for failure to exhaust administrative remedies. If this were a matter where agency expertise was required or the plaintiff was trying to short-circuit the administrative process and an administrative record would be of benefit, the Court would hold differently. *See* City of New York v. New York Telephone Company, 468 F.2d 1401 (Em.App. 1972); *see also* McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).

■ Defendants' third argument in moving to dismiss the complaint is that § 211(d)(2) of the Economic Stabilization Act prohibits this Court from granting plaintiff injunctive relief. This section provides that:

A district court of the United States or the Temporary Emergency Court of Appeals may enjoin temporarily or permanently the application of a particular regulation or order issued under this title to a person who is party to litigation before it.

Defendants contend that the plaintiff ANHA is not a "party" to this litigation and therefore should be denied injunctive relief.[11] The Court understands that the legislative purpose of this judicial review provision included the recognition by Congress of the need for speed and consistency of decisions in cases arising under the Economic Stabilization Act and the avoidance of any breaks or stays in the operation of the stabilization program.[12] This Court cannot so narrowly interpret the meaning of "party" as to foreclose an association such as plaintiff from seeking injunctive relief. Clearly, plaintiff is an aggrieved "party" and it has every right to seek injunctive relief in this action.[13]

III. Declaratory and Injunctive Relief.

Plaintiff has prayed for preliminary and injunctive relief as well as a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202. In this regard, plaintiff asserts that these Phase IV regulations on institutional providers of health services are arbitrary and capricious as applied to nursing homes and in violation of the Fifth Amendment to the United States Constitution, the Economic Stabilization Act of 1970, as amended, and Titles XVIII and XIX of the Social Security Act.

Although the parties have had oral argument only as to the questions involv-

---

a denial, courts have looked unfavorably in the past on agencies which delay for undue periods of time in decision-making and subsequently raise exhaustion of administrative remedies in court as a defense. Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 397, 428 F.2d 1093, 1099 (1970); Deering Milliken v. Johnston, 295 F.2d 856, 867–68 (4th Cir. 1961).

11. The sister provision of § 211(d)(2) is § 211(e)(1), which states:

Except as provided in subsection (d) of this section, no interlocutory or permanent injunction restraining the enforcement, operation, or execution of this title, or any regulation or order issued thereunder, shall be granted by any district court of the United States or judge thereof.

12. Senate Report No. 92–507, 92nd Cong., 1st Sess., 10–12 (1971), U.S.Code Cong. & Admin.News 1971, p. 2283.

13. *See* Jennings v. Connally, 347 F.Supp. 409, 418 (D.D.C.1972) (injunction granted to a union challenging COLC regulations); Retail Clerks International Association v. Shultz, 352 F.Supp. 480 (D.D.C.1972) (injunction denied to union challenging COLC regulations but court did not deny its jurisdiction to grant such relief). *See, e. g.,* Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

ing the motion to dismiss and the preliminary injunction, the Court feels that the merits have been argued with sufficient particularity in both the papers and in open Court for the case to be decided here on its merits.

■ Plaintiff's most persuasive argument for this Court permanently enjoining the application of these regulations is that they so clearly conflict with the cost reimbursement scheme devised by Congress under Titles XVIII and XIX of th Social Security Act. The Court is well aware that the Cost of Living Council has been given great latitude and their regulations should be given great deference by any court upon review. United States v. Lieb, 462 F.2d 1161, 1166 (Em.App.1972). It could even be argued that Congress in passing the Economic Stabilization Act understood that for the good of the nation certain statutes passed by Congress may be subject to different interpretation in light of the COLC mandate to check inflation. But this Court is convinced that Congress did not intend a scheme of reimbursement so strictly controlled by audit and governmental review as is inherent in Medicare and Medicaid to be partially set aside by COLC regulations that at best have a questionable basis in fact for checking inflation.

It is evident that the costs of nursing home care have not even kept pace with the general cost of living index. Again, it is appropriate to quote from the COLC's own staff study:

> Nursing home care aggregate expenditures are very minor in proportion to other health sectors. The grouping of health care industries (hospitals and nursing homes) into one category, and applying one regulatory limit for all, discriminates against those institutions that have contributed the least to the inflationary situation. This is

evident when you consider that 60 percent of all public and 30 percent of all private expenditures in fiscal 1970 went for hospital care, while only 9 percent of all public and 3 percent of all private expenditures went for nursing home care. (These figures are from the Department of Health, Education, and Welfare.)

The cost of nursing home care has not kept pace with the cost of living index. The cost of living has risen more rapidly than the cost of nursing home care. The spread has even widened since 1969, and the nursing home industry is below the national cost of living increases.

\*　　\*　　\*　　\*　　\*　.　\*

Although no national price indexes (i. e., CPI) exist for nursing homes, Medicare data shows that the inflationary impacts of long-term and convalescent care facilities has been significantly smaller than for hospitals. The average cost per claim for inpatient hospital care under Medicare has increased from $508 in 1966–67 to $840 in 1972. That is an increase of 65 percent (11.2% per year compounded). During the same time the average cost per claim for care in an extended care facility increased by $89 from $307 to $396 or approximately 29 percent (5.25% per year compounded). For the above reason alone it is probably invalid to control nursing homes and hospitals with the same set of regulations. From the above statistics it might be argued too that a good case exists for decontrolling nursing homes altogether.[14]

In addition, the record is replete with much information showing the drastic consequences of the COLC policy as to cost reimbursement. Robert J. Myers, a Professor of Actuarial Science at Temple University and a 36-year employee of

---

14. COLC Option Paper at 4. It should be noted that although this is an option paper, the above-quoted section does not derive from a portion of the paper considering options. On the contrary, this information is from a section headed "Background." In

addition, counsel for the government in open Court admitted that there are no statistics to show that the nursing home industry is in fact an inflationary factor in the economy requiring such stringent and discriminatory restrictions on cost reimbursement.

the Social Security Administration, has stated with sufficient supporting rationale that:

> The Cost of Living Council's continued restrictions on allowing nursing homes to fully recover reimbursement to which they are entitled under Medicare and Medicaid for the costs of services which they provide, will prevent any upgrading in the quality of care in these facilities and eventually result in a reduction in the quality of care, all of which will directly affect the well being of the patients in these facilities.[15]

The Court also notes that plaintiff through these regulations has been deprived of a dollar-for-dollar pass through as to increases in costs of such items as safety and health improvements required by statute as well as food costs while other sections of the economy have been allowed such pass through.[16] Of course, the COLC should be allowed a sectoral approach to inflation but when there is no rational basis for treating nursing homes so harshly, this Court can only find the COLC regulations arbitrary and capricious and an undue interference with the cost reimbursement scheme set up by Congress for Medicare and Medicaid.

The Court is convinced from all the evidence presented that irreparable harm to the nursing home industry will result if these regulations are not immediately and permanently enjoined. Furthermore, it is clear that the public interest will not be injured if these regulations are enjoined since there is no evidence that the nursing home industry is a major contributor to inflation. Furthermore, the Congress has established comprehensive and stringent measures to assure that reimbursement is only for "reasonable cost." As noted. in the COLC memorandum:

> Long term nursing care has grown over the last few years while Medicare has decreased. Long-term care facilities are providing care at a cost far less than hospitals. Additionally, as the Medicaid caseload increases, nursing homes come under far greater controls since Medicaid is regulated by Federal and State regulations. Therefore, the nursing homes are already dually controlled without price controls.[17]

In conclusion, the Court must add that it is aware of the proposed regulations of the COLC which might moot many of the objections presented to the Court by plaintiff. However, the Court is also aware that section 150.502 provides that the rules here challenged will remain applicable until the completion of the current fiscal year. The Court has been informed that some nursing homes would thus be subject to these arbitrary and capricious regulations until the Fall of 1974 since that is the end of their fiscal

---

15. Affidavit of Robert J. Myers at 4. Professor Myers is an unquestioned expert in the field of Medicare and Medicaid and has published a book on Medicare. *See generally* for the drastic effects of COLC regulations on nursing homes: Affidavits of John E. Richard, Vice President of Oregon Health Care Association at 2 (threatens adequate level of patient care) ; Willis H. LaVance, Director of Finance and Accounting-Colorado Department of Social Services at 2 (might have to cut back services) ; James Hiniker, Deputy Commissioner, Minnesota Department of Public Welfare at 2 (quality of care may be jeopardized) ; Colan Taylor, owner of Taylor Nursing Homes at 2 (may have to cut back patient programs) ; LaVern Huenergardt,

President of Colorado Health Care Association at 3 (have to cut back individual attention to each patient).

16. See Decision and Orders of the COLC, September 7, 1973, allowing all major automobile manufacturers pass through of "Federally mandated bumper and safety equipment costs for all 1974 model vehicles."

17. COLC Option Paper at 3–4. See pages 4 and 5, *supra*, as to Federal controls on reimbursement. It is important to emphasize that 75% of all nursing home revenues come from public sources; thus, this government control covers three-fourths of all nursing home monies.

year due to their bookkeeping procedures. For this reason, the Court finds it inappropriate at this time to discuss the effect of the proposed regulations on plaintiff's complaint.