UNITED STATES of America, Plaintiff-Appellant, Cross-Appellee,

v.

William E. COLWELL, El Lorenzo Apartments, Defendant-Appellee, Cross-Appellant.

Nos. 9–16, 9–17.

Temporary Emergency Court of Appeals.

March 10, 1975.

Allen L. Feinstein, Daughton, Feinstein & Wilson, Phoenix, Ariz., for plaintiff-appellant, cross-appellee.

Bruce Forrest, U. S. Dept. of Justice, Carla A. Hills, Asst. Atty. Gen., Stanley D. Rose, Paul T. Michael, John N. Hanson, William Gibney, Attys., U. S. Dept. of Justice, Washington, D. C. on the brief for defendant-appellee, cross-appellant.

Before CARTER, HASTIE and CHRISTENSEN, Judges.

HASTIE, Judge.

This is a civil suit under the Economic Stabilization Act of 1970, P.L. 91–379, 84 Stat. 799, brought by the United States against the landlord of a residential apartment building in Phoenix, Arizona. Depositions and statements of undisputed facts led to final judgment on cross motions for summary judgment. The district court ordered restitution of the amounts of alleged rental overcharges, aggregating about $600, to four tenants who were in possession when rent control was instituted and denied relief

sought for some 15 other persons who became tenants after rent control had been instituted. The court also imposed upon the landlord a civil penalty of $500. The government appealed from the relief denied and the landlord cross appealed from the relief granted.

The alleged overcharges occurred during the latter part of 1971, the period of the rent freeze, and continued into the period during which rents could not lawfully be increased except in accordance with so-called "Phase II" federal rent regulations.

The property in question is a small apartment building that was first opened for occupancy during the winter of 1970–1971. Several months later, the President, acting under the Economic Stabilization Act, temporarily froze all rents, effective August 15, 1971, at levels ordinarily determined by the rates that were in effect during the immediately preceding month, July 15 to August 14, 1971, called "the base period". Executive Order 11615 of August 15, 1971, 36 F.R. 15727.

The apartment building contained 24 substantially equal rental units. During the base period, 12 of them were occupied under written annual leases for $175 per month and 12 were occupied under oral month to month agreements for $155 per month. Only the second 12 are involved in this litigation.

The government conceded the correctness of assertions in the defendant's "Statement of Specific Facts in Support of Motion for Summary Judgment" that the apartments were ready for rent in December, 1970 or January, 1971; that "the initial [monthly] rental rate was $450 . . . the prevailing winter rate for the Phoenix-Scottsdale area for similar apartments"; that in March and April the winter tenants began to vacate the apartments; that thereafter the apartments came to be rented at progressively lower monthly rates from $175 down to $155, with the $155 summer rate beginning in May.

Before the rent freeze, the landlord had advised the month to month tenants that their rent was to be increased to $175. However, on August 17, immediately after the freeze became effective, the landlord wrote to each tenant as follows:.

"With President Nixon's new economic policies coming right on the heels of my letter of August 12, 1971, I felt that some clarification was needed. I therefore contacted the appropriate federal housing office and received from them the following opinions.

"(A) The making available of 12 month leases at $175.00 per month is not considered a rent increase due to the fact that $175 per month has been the monthly rate at El Lorenzo since mid-June. It is just saying that if you want a lease, you must pay the current rent rate and not the old rate that was in effect when you rented the apartment.

"(B) Residents not wishing to sign a 12 month lease and whose rent is below $175.00 per month will not have their rent increased after September 14, 1971, as my original letter stated. This change is occasioned by the President's new policy.

"(C) During the winter season, we probably will raise rents to the usual seasonal level, but they may not be raised above the seasonal level used last winter.

"If there are additional questions, please contact me at my office."

The record shows that, responding to the quoted communication, some tenants elected to sign annual leases at $175 monthly. Others elected to continue possession for the time being as $155 monthly tenants and then to move out before the beginning of the high rent season. All new tenants involved in this case signed annual leases at the $175 rate.

We consider first whether, during the period of the 1971 rent freeze, the landlord can properly be said to have imposed annual leases at a $175 rate upon his tenants who were in possession under month to month agreements. It is not

disputed that the effective action of the landlord is accurately reflected by his above quoted letter of August 17. That letter offered each tenant who wished to remain two options; to sign a new annual lease at a rate of $175 per month or to continue under the existing oral monthly rental agreement, paying $155 a month throughout the summer but subject after the end of that season to an increase to a rent not to exceed the prevailing winter rate. There is no doubt about the genuineness of these options. Indeed, some tenants chose one and some the other.

We will assume that a requirement that month to month tenants sign an annual lease at the $175 rate or vacate the premises before the end of the low rent summer season would have constituted a violation of the freeze. But no such requirement was imposed. Each tenant was free to continue under the oral month to month agreement and, for the time being, at the $155 per month summer rate. Obviously, that was unobjectionable, unless the attendant warning, that during the months ahead the substantially higher winter rate was likely to be charged, incorporated in this option a threat of an illegal prospective increase.

A pertinent guideline, published in Economic Stabilization Circular No. 101 of September 21, 1971, § 303(1), ES 1, Appendix 1, 32A C.F.R. 39, 40, provided that rents "which normally fluctuate in distinct seasonal patterns . . . may be adjusted during the . . . freeze . . . ." An example was given of Puerto Rican hotel rates that change "at the beginning and end of the fall/winter season". 32A C.F.R. 55. The record shows that the month to month rents for the apartments in this case had in fact fluctuated seasonally from a $155 summer low to a $450 winter high and that in Phoenix $450 was the prevailing rent for similar apartments from December through March. Equally illuminating is the record showing as to one of the apartments in this case. The monthly tenant moved out of Apartment 7 during the fall of 1971. A new monthly tenant moved in for the winter season and paid the prevailing winter rate. The government does not claim that this was illegal. It seems clear, therefore, that such an upward adjustment of rent for monthly tenants as the landlord predicted in the last paragraph of his August 17 communication was lawful. The landlord's suggestion that this would occur was not an exercise of improper pressure to accept the alternative of an annual lease, particularly since a month to month tenant who chose to continue as such an entire year could lawfully be charged more than $3,000 for the 12 month period. But if he elected to sign an annual lease his total rent would be only $2,100.

With a view to short term occupancy, the month to month tenants who intended to leave by the end of the summer elected to retain the advantage of the $155 rate until their departure. But for those who wished to remain into or throughout the winter, the execution of the proffered annual leases yielded substantial savings through avoidance of the large winter increase. Thus, the actuality of this case is that, because of the lawful seasonal fluctuation of month to month rates, those old tenants who elected to change to annual leases paid less rent over the ensuing months than they otherwise would lawfully have been required to pay.

Only by ignoring the significance of permissible seasonal rent fluctuations for this case and focusing exclusively upon the fact that the old monthly tenants paid $155 rent for the "base" month beginning July 15, 1971, has the government been able to characterize the landlord's substitution of annual leases at a more economical constant rate for month to month rental at a fluctuating rate as an increase in rent. Moreover, this position was taken despite the fact that the Rent Stabilization Regulations themselves recognize the arbitrariness of using the unadjusted base period rent as the determinant of the rent ceiling in this type of case. More important than the Circular already cited, Regulation

§ 301.204, 6 C.F.R., 1973 ed., § 301.204 states that a "residence, for which the rents show distinct fluctuations at seasonal or other predictable points in time, shall have a base rent which reflects those fluctuations . . . [To accomplish this] the base rent [as ordinarily computed] shall be adjusted upwards or downwards, as may be appropriate, in determining the rent which may be changed for each rent payment interval during the year". In this case the arbitrary and unreasonable administrative insistence that the landlord had overcharged his tenants seems to have proceeded from total disregard that fairness dictates and the regulations authorize the rental adjustment the landlord made.

The foregoing analysis applies with equal force to the situation of new tenants who signed annual leases yielding $175 per month at or after the end of the 1971 summer season. Obviously, they contemplated occupancy during or throughout the season of high monthly rent. As monthly tenants they could have been charged up to $450 during the fall and winter seasons and, over a 12 month period, much more than they paid under their annual leases. Therefore, for the administrative agency to treat as an overcharge the $20 per month in excess of $155 that the new tenants were required to pay, was just as arbitrary and contrary to the applicable regulations as was the similar treatment of the same amount paid by old monthly tenants under their new annual leases.

Both parties have cited to us our decision in United States v. Lieb, Em.App., 1972, 462 F.2d 1161. The controversy there was whether the permissible rent for an apartment was the amount actually charged for that unit during the "base period" or the rent charged during that period for a substantial volume of similar properties. That case involved neither seasonal rent fluctuation nor change from monthly to annual tenancy, a combination of considerations that distinguishes this case and is controlling here.

Finally, since the landlord did no wrong, the $500 penalty imposed upon him cannot stand. He is entitled to prevail fully on his cross appeal while the government's appeal is held to be without merit.

The judgment of the district court is vacated and the cause remanded for entry of summary judgment for the defendant.