480

CARPENTERS 46 COUNTY CONFER-
ENCE BOARD et al.,
Plaintiffs,

v.

The CONSTRUCTION INDUSTRY STA-
BILIZATION COMMITTEE et al.,
Defendants.

No. C–73–1912 AJZ.

United States District Court,
N. D. California.

April 22, 1975.

Levy & Van Bourg, Victor J. Van Bourg, David A. Rosenfeld, San Francisco, Cal., for plaintiffs.

James L. Browning, Jr., U.S. Atty., William T. McGivern, Jr., Asst. U.S. Atty., San Francisco, Cal., Chester W. Kitchings, Jr., Atty., Economic Stabilization Section, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

ORDER STAYING DECISION OF CROSS-MOTIONS FOR SUMMARY JUDGMENT AND CERTIFYING CONSTITUTIONAL ISSUE TO TEMPORARY EMERGENCY COURT OF APPEALS

ZIRPOLI, District Judge.

This case involves a broad-based attack on the Nixon Administration's Economic Stabilization Program of 1971–74.

Plaintiffs are the Carpenters 46 County Conference Board, Local 34 of the United Brotherhood of Carpenters,[1] and three officials of these labor organizations, which represent workers in the construction industry in Northern California. Defendants are the Construction Industry Stabilization Committee (CISC) and its chairman, John T. Dunlop. The issue is whether CISC properly disapproved all but 15 cents of the 65 cent wage increase plaintiffs were scheduled, under a collective bargaining agreement, to receive beginning in June, 1973. Both plaintiffs and defendants have moved for summary judgment. In order to resolve plaintiffs' multiplicity of attacks on CISC's action, the court must first outline the development of the Economic Stabilization Program and review the history of the dispute between plaintiffs and defendants over the June, 1973, wage increases.

## I. *The Regulatory Background*

The regulatory framework of the Program was complicated and fluid. Its source was the Economic Stabilization Act of 1970, 84 Stat. 799. Section 202 of the Act empowered the President to issue "such orders and regulations as he may deem appropriate to stabilize prices, rents, wages and salaries." Section 203 permitted the President to delegate performance of any function under the Act to such officers as he deemed appropriate. From this simple and broad beginning, the Act has grown by amendment as Congress has attempted to delimit the power delegated to the President. Thus, on May 18, 1971, it added section 202(b) which stated that the President's power to issue orders as to any given industry should not be exercised

> unless the President determines . . that prices or wages in that industry

or segment of the economy have increased at a rate which is grossly disproportionate to the rate at which prices or wages have increased in the economy generally.

85 Stat. 38.

On March 31, 1971, the President made his first use of power conferred upon him by the Act in Executive Order 11588, which recited that "wages and prices in the construction industry have tended in recent years to increase at a rate greater than that for the economy as a whole." In response to this problem the Order created CISC and, under it, various Craft Boards, to review proposed increases in wages in the construction industry. CISC was to consist of ten members, four from labor, four from management and two "public" members. Section 6 of the Order established various criteria that were to be applied to such proposed increases, looking to matters like increases in productivity and the traditional hierarchy of wages among different crafts. The Order required that all proposed increases be approved by CISC before being put into effect. CISC soon went into operation and began to review wage increases proposed in collective bargaining agreements submitted for its approval.

On August 15, 1971, the President inaugurated his economy-wide Economic Stabilization Program with Executive Order 11615. Section 1 of this Order stabilized (froze) prices, rents, wages and salaries for 90 days, thereby beginning what was popularly known as Phase I of the Program. The Order established the Cost of Living Council (CLC), section 2, delegated to the CLC all powers conferred upon the President by the Act, section 3, and permitted the CLC to redelegate these powers. Section 4(b).

---

[1]. The parties agree that, for purposes of this motion, the Carpenters 46 County Board should be considered the representative plaintiff and that Local 34's claims should stand or fall with the Board's claims. Hence, the court shall hereinafter discuss only the development of the Board's dispute with CISC, and all references to "plaintiffs" refer to the Board and its members and officials, some of whom are named plaintiffs in this lawsuit.

Two months later the President announced Executive Order 11627, beginning what came to be known as Phase II of the Program. Section 1 of the Order stated that it was to be substituted for Executive Order 11615. Sections 2 and 3 continued the CLC in existence and continued the earlier delegation of power to CLC. Section 7 established the Pay Board, which was to perform functions delegated to it by the CLC with respect to stabilizing wages. Section 14(a) continued CISC in existence but section 14(c) revoked section 6 of Executive Order 11588, which had set out the criteria that CISC should apply to proposed wage increases. The same day the CLC issued its Order No. 3, 36 Fed. Reg. 20202, which delegated the Pay Board authority to establish criteria, standards and procedures for stabilization of wages. On November 13, 1971, the Pay Board issued its Order No. 2, 36 Fed.Reg. 21875, which authorized CISC to administer the Board's policies in the building and construction industry, but provided that the Board would prescribe the form of procedures to be utilized by CISC.

On December 22, the President signed the Economic Stabilization Act Amendments of 1971, 85 Stat. 743, which greatly expanded the Act's provisions. Section 203 was amended to require that Presidential Orders include a statement of reasons and that the President issue standards that would make administration of the program "generally fair and equitable" by taking into account changes in productivity and to provide for reductions in prices and rents to correspond to wage declines. Section 203(c) was added to limit the President's power to limit wage increases scheduled to take place in the future in several ways. Section 207 was added to the Act establishing certain procedural requirements for agency action under the Act, but exempting the agencies from most of the requirements of the Administrative Procedure Act. Section 211 was added to the Act to provide for

judicial review of agency action under it. It reposed exclusive jurisdiction of cases arising under the Act in United States district courts and created a Temporary Emergency Court of Appeals (TECA) to hear appeals from decisions of district courts. Section 211(d)(1) limited the authority of a reviewing court to determine whether a challenged order issued under the Act "is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence." Additionally, under sections 211(c) and 211(g), the district courts were prohibited from enjoining an order issued by an agency on constitutional grounds and required to certify all substantial constitutional challenges to an order to the TECA. On January 26, 1972, the President issued Executive Order 11640, which was designed to reflect the changes made by the Amendments and substituted for Order 11627. Section 1 continued in existence the Pay Board and the CLC. Section 3 continued the delegation of authority to CLC; section 4(b) permitted the CLC to continue to redelegate authority. Section 15 continued CISC in existence and continued the revocation of section 6 of Order 11588 in effect.

On January 28, the Pay Board and CISC jointly announced the issuance of an amended Pay Board Order No. 2, which was published in the Federal Register on April 25. 37 Fed.Reg. 8110. Pursuant to the authority of Executive Order 11640, it again authorized the CISC to administer its regulations with respect to collective bargaining agreements in the construction industry. Additionally, it set forth certain "Substantive Policies" that CISC should apply to such agreements. Paragraph 2 of these policies stated that no agreed wage increase should be entitled to automatic approval. Paragraph 3 provided that fringe benefits should be considered along with other benefits (such as wages) in determining the propriety of the proposed economic adjustments.

Paragraph 4 set guidelines for application of exceptions in individual cases. Paragraph 5 provided in part that

> Deferred increases which would cause unstabilizing effects in a locality or among localities (i. e., which would prove unreasonably inconsistent with the application of such standards to a locality or a branch of the industry), should be promptly reviewed and agreement sought on adjustments at a local level or the adjustment spread over a sufficiently long period to reduce unstabilizing effects and to achieve settlements at reasonable amounts.

On January 11, 1973, the President issued Executive Order 11695 which continued his Economic Stabilization Program into Phase III. Section 1 continued the CLC in existence and section 2 delegated all the President's powers to the Chairman of the CLC. Section 3(a) continued in effect all regulations issued under any of the previous Orders and in effect at that time. Section 5 continued CISC as an agency of the United States. Section 10 abolished the Pay Board. The following day the CLC issued its Order No. 16, delegating to the CISC authority to administer its policies in the construction industry and arguably expanding the CISC's role in the Program. See Associated Gen. Contractors of America v. Laborers' Int'l Union, 476 F.2d 1388, 1401 (Em.App.1973). On February 26, 1973, the CISC issued as a press release its 1973 Policies, which were quite similar to those set out in the amended Pay Board Order No. 2 published in the Federal Register the previous April.[2] In particular, paragraph 2(a) provided that the CISC could approve economic adjustments on a case-by-case basis

> [w]here the parties have made a careful review of the economic provisions of their collective bargaining agreement and have provided for an economic trade-off between increases in wage rates or benefits and other provisions of the agreement in view of the impact of the agreement on costs of construction.

Additionally, paragraph 5 provided that

> [d]eferred increases will continue to be reviewed by the Committee, and those which would cause unstabilizing effects on other negotiations in the industry may be disallowed by the Committee as in the past.

On April 30, 1973, Congress enacted, and the President signed, the Economic Stabilization Act Amendments of 1973. These amendments extended the Program for another year, to April 30, 1974, and, among other things, added a proviso to section 207(b) of the Act requiring that agencies created under the Act

> shall issue no order which has the effect of reducing wages, or salaries in effect, or proposed to be put into effect, in an appropriate employment unit unless such order is made on the record after opportunity for a hearing. Not less than thirty days after issuance of such an order, a statement of explanation shall be directed to the affected parties and made available to the public. Such statement shall include a fair explanation of the reasons why the existing wage or salary, or proposed wage or salary adjustment, does not meet the requirements of or the standards established by the regulations prescribed by that agency.

Congress made no further amendments to the Act.[3]

---

2. The 1973 Policies were not published in the Federal Register until November 29, 1973, long after plaintiffs' hearing in this case had been held. See 38 Fed.Reg. 33030.

3. Congress did not extend the Program beyond April 30, 1974. In Executive Order 11781, issued May 6, 1974, the President continued the CLC in effect "to consider matters properly before it that relate to wages paid for work performed prior to May 1, 1974, and prices charged prior to May 1, 1974." Section 8 of that Order continued CISC in existence and provided that it should "continue to perform such functions with respect to the stabilization of wages and salaries in the construc-

It is against this statutory and regulatory background that the court must evaluate the CISC's refusal to allow the full 65 cent wage increase scheduled for June, 1973, to take effect.

## II. *The Facts of This Case*

In mid-1971 the existing collective bargaining agreement between plaintiffs and various employers' associations expired and plaintiffs went on strike to obtain the various items they wanted in their new contract. They entered into an agreement with employer associations that was to extend from June 15, 1971, to June 14, 1974. This agreement provided for various increases in wages and in fringe benefits at intervals during its three year lifetime, culminating in a 25 cent increase in fringe benefits on June 1, 1973, and a 65 cent increase in wages on June 16, 1971, bringing plaintiffs' wage package to $10.90 per hour. They submitted the agreement to the National Carpenters' Craft Board, which approved it and sent it along to the CISC. CISC in turn approved the agreement on September 3, 1971, subject to the wage freeze in Exective Order 11615.

On November 12, 1971, CISC gave notice that no further increases could go into effect even though it had previously approved them, relying on Executive Order 11627 and Pay Board Order No. 2. On January 17, 1972, CISC approved a 5 cent increase scheduled for the previous January 1. On March 30, May 5, June 28 and July 27 it approved other increases in wages or finge benefits as provided in the agreement.

On February 20, 1973, CISC sent a letter to the National Carpenters' Craft Board indicating that the increases scheduled for June, 1973, "appear to be in excess of 1973 guidelines." Plaintiffs claim they never received this letter, but they clearly became aware of its existence for, on March 9, John Rebeiro, Chairman of the Carpenters' 46 County Board and a plaintiff here, wrote a letter to Secretary of Labor Brennan about it. In the letter Rebeiro suggested that he had two possible courses of action open to him should the CISC not approve the increases: a class action lawsuit or a general strike. On May 11 there was a meeting between representatives of plaintiffs and CISC to discuss the proposed increases. On June 14, CISC voted on whether to approve the full increases. All the labor members voted in favor of the full increases. All the other members voted against such approval. On June 18, the CISC sent letters to the Craft Board approving the full increase in fringe benefits, but approving only 15 cents of the proposed 65 cent wage increase. This letter was sent to plaintiffs, and stated in part that "[t]he parties are advised to renegotiate the agreement and submit it to the Craft Board for review and resubmission to the Committee." A cover letter advised plaintiffs that, under section 207(b) of the Act, they could request further review, including a hearing.

On June 22, plaintiffs requested a hearing. On July 12 and 13 their counsel requested various pieces of information about the hearing procedure by letter and demanded a complete explanation of the CISC's decision not to approve the full wage increase. On August 7, Joe Russell, the Executive Director of the CISC, responded by letter, answering counsel's questions and providing a "brief statement" of the CISC's reasons for preliminarily disapproving the full increase.[4] On August 17, a hearing was held before Stuart Roth-

---

tion industry as the Chairman of the Council may delegate to it, for purposes of accomplishing the orderly conclusion of the activities of the CISC through June 30, 1974." In Executive Order 11788, issued June 30, 1974, the President provided for the orderly termination of the Program. Section 7(4) abolished CISC, leaving it the longest-lived organization created under the Economic Stabilization Program.

4. Russell explained CISC's views as follows:
 A brief statement of the Committee's rationale can be given. It appeared to the Committee that to allow economic adjustments of 90 cents for the June 1973 con-

man, a public member of the CISC, at which plaintiffs were represented by counsel and presented evidence to justify the wage increase. During September there was an interchange of letters between counsel for plaintiffs and the staff of the CISC in which counsel for plaintiffs chose to stand on the record of the hearing rather than submit a formal written statement of his position.

On October 25, plaintiffs undertook one of the courses of action suggested by Mr. Rebeiro in his letter to Secretary Brennan. They filed their complaint in this case, seeking to represent a class composed of "all district councils and local unions who engage in negotiating and enforcing collective bargaining agreements for and on behalf of all carpenters." They prayed an injunction restraining CISC from limiting the wage increase they received. On November 12, various carpenters' unions, including plaintiffs here, apparently decided to pursue the alternative course of action Rebeiro suggested in his letter and began to picket their employers in an attempt to force them to disobey CISC and pay the entire amount of the negotiated wage increase. The employers filed two lawsuits in response, Swinerton & Walberg Co. v. Bay Counties Dist. Council of Carpenters, No. C–73–2056 LHB, and Associated General Contractors v. Carpenters 46 County Board, No. C–73–2060 LHB. On November 16, Judge Wollenberg of this court issued a temporary restraining order against such picketing and on December 7, Judge Burke preliminarily enjoined it. When plaintiffs refused to obey the preliminary injunction contempt proceedings were begun, but plaintiffs eventually complied with

the court's order. These cases remain open.

In October, CISC reconsidered the proposed wage increase, but took no action. On December 4, plaintiffs telegrammed CISC that, except for the claims they make in this lawsuit, they would accept a wage increase of 25 cents, 10 cents more than the CISC had indicated it would approve. On December 6, the CISC voted on the proposed increase. Again, all labor members favored the full increase, while all other members opposed it. On December 7, the CISC issued its order approving a wage increase of only 15 cents.

On January 4, 1974, CISC issued its explanation of the December 7 order in a statement authored by its new chairman, Daniel Quinn Mills. The statement explained that CISC had considered the claimed cost-saving factors relied upon by plaintiffs—looser work rule restrictions, permission to employers to choose up to 25 percent of their work force from any source and to subcontract installation of foundations. It had balanced against these features certain cost-increasing provisions—a decrease in the work week, increases in subsistence pay and in pay for general foremen and the requirement that employers provide parking. Since it had already taken these cost-saving components of the agreement into account when it approved earlier increases provided in the contract, it concluded that, under paragraph 2(a) of its 1973 Policies, the further increases were not justified by the cost-saving elements of the agreements.

Instead, CISC found that to allow an increase of more than 15 cents "would cause unstabilizing effects on other ne-

tract year would cause unstabilizing effect [sic] on other negotiations in the industry. This preliminary finding was made following an analysis of the historic relationship of this craft to other crafts in the same city and to other Carpenters in California. In addition, the Committee considered the relationship of the Carpenters to other crafts in areas of Northern California outside of the Bay Area. The

economic adjustments then had to be viewed in the context of the economic adjustments approved by the Committee over the last two years, other negotiated economic adjustments and Committee recommendations in Northern California and across the state, and the impact of the economic adjustments in this agreement on negotiations across the state in the next few years.

gotiations in the industry," apparently relying on paragraph 5 of its 1973 Policies. In support of this conclusion it explained that the wage structure in the construction industry in California had become distorted in the late 1960s and early 1970s. This distortion was the result of "leapfrogging," a process whereby unions would compete with one another for ever larger increases in wages.[5] To counteract this tendency, CISC had undertaken, in evaluating each proposed increase in California, to reestablish the historic relationship between crafts in the construction industry in Northern California and between the carpenters of Northern California and Southern California. Feeling that the increase in the differential between the Operating Engineers and the carpenters from 51 cents in 1960 to $1.09 in 1972 was unjustified, for example, CISC had approved a package increase of only 30 cents for the Operating Engineers in 1973, compared with the 40 cent package it had approved for the carpenters. Similarly, it attempted to redress the gap between the carpenters of Southern California and Northern California, which had grown from 6 cents in 1960 to $1.11 in 1972, by approving a package increase of 55 cents for the Southern California carpenters, 15 cents more than that allowed their Northern California brethren.

Finally, CISC rejected plaintiffs' contention that the growth in the cost of living justified the full increase in wages. In fact, it noted, the Consumer Price Index for the San Francisco Bay Area had increased only 40 percent during the period 1960–73, while the wage and fringe package for Northern California carpenters had increased 155 percent. Similarly, from June, 1970, to June, 1973, the Consumer Price Index had increased only 13 percent, compared with an increase of 25 percent in the carpenters' wage package.

After the adverse decision, plaintiffs appealed and were granted a further review. They enlisted the support of various employer groups, which joined in their request that the wage increase be permitted to go up to 25 cents. On February 19 the CISC denied the appeal on the ground that plaintiffs had presented no basis for changing the earlier decision. Again the labor members of the CISC all lined up in support of the full increase while all the managemnt and public members voted to affirm the earlier decision.

### III. *Plaintiffs' Contentions*

As Part I of this order indicates, the regulatory framework within which CISC operated was exceedingly complex and fluid. Since Congress, the President and the agencies he created were writing on a nearly clean slate,[6] the courts had some difficulty developing meaningful standards for review of action by agencies created under the Act. While Congress amended the Act to provide greater protections for those aggrieved by actions of agencies created under it, it never repealed section 211(d)(1) and the courts, consequently, have a very limited scope of review. Plaintiffs have sought to invoke this review by raising a variety of contentions about the propriety of CISC's handling of their contract, and of its business in general. Plaintiffs' contentions fall generally into three categories: (1)

5. Mills explained that the "leapfrogging" problem was particularly troublesome in the construction industry because that industry has an unusually large number of unions. While there may be only one union representing most of the workers in another industry, for example the auto industry, in construction the multiplicity of unions breeds inter-union competition that is not so prevalent in other industries.

6. During World War II and the Korean War Congress had enacted similar emergency wage and price controls. *See, e.g.,* Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). While the courts therefore had some precedents to rely upon, the different programs required substantially different treatment, and the courts had to tailor their rules of review to the contours of the given program.

claims that the CISC was without authority to act on the June, 1973, increases; (2) claims that the procedure it used to review these increases was deficient under its regulations, the Act or the Constitution; (3) claims that the substance of its review was inadequate. The slate is no longer clean, however; before discussing plaintiffs' specific contentions, the court adverts to three themes that the TECA has indicated should control review of agency action under the Act.

■ First, the courts should take into account the "gargantuan task" the Congress and the President set for these regulatory agencies in assessing their compliance with their mandate. University of Southern California v. Cost of Living Council, 472 F.2d 1065, 1072 (Em.App.1972), cert. denied, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). The first court to confront a broad-based constitutional attack on the Program observed that "[i]n other contexts when agencies have been given enormous regulatory tasks, the courts have interpreted the underlying statutes to take account of what is feasible." Amalgamated Meat Cutters & Butcher Workers v. Connally, 337 F.Supp. 737, 758 (D.D.C.1971) (three-judge court). The TECA has recognized that "the task of filling in the interstices of the skeletal outline provided by the Order, and of literally injecting life into the program, was consigned to the CLC." University of Southern California v. Cost of Living Council, supra, 472 F.2d at 1067. Given the enormity of the task, "complete success, or complete fairness, is neither possible nor required in this kind of administrative action." Pacific Coast Meat Jobbers Ass'n v. Cost of Living Council, 481 F.2d 1388, 1391 (Em.App.1973). The administrators are only asked to do what is humanly possible.

■ Second, "[i]t is a well settled principle that the courts place great weight on the interpretation given to statutes and regulations by those agencies charged with the responsibility of administering them." University of Southern California v. Cost of Living Council, supra, 472 F.2d at 1068-69. Expanding on this point in Pacific Coast Meat Jobbers Ass'n v. Cost of Living Council, supra, 481 F.2d at 1392, the TECA quoted Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965):

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. . . . "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.' "

See also United States v. Lieb, 462 F.2d 1161, 1166 (Em.App.1972). Given the limited scope of the court's review, it appears that it need only ask that the interpretaion given a statute or regulation. by the administrative agency be reasonable. See University of Southern California v. Cost of Living Council, supra, 476 F.2d at 1068; cf. Udall v. Tallman, supra, 380 U.S. at 16-18, 85 S.Ct. 792.

■ Third, the court is to give great deference to the agency's evaluation of the factual material before it. United States v. Electrical Workers Local 11, 475 F.2d 1204, 1209 (Em.App.1973). The TECA has therefore recognized that "[t]his type of judgment, involving the balancing of interrelated economic factors, is peculiarly within the expertise with which CISC is presumptively endowed." Plumbers Local 519 v. Construction Indus. Stabilization Comm., 479 F.2d 1052, 1056 (Em.App.1973).

Appreciating the enormity of the task thrust upon the administrators by the Program, giving appropriate deference to their interpretation of the Act and the Executive Orders and regulations

promulgated under it and to their superior ability to weigh the facts and equities in individual cases, the court proceeds to consider plaintiffs' specific contentions.

A. *CISC's Authority to Act in 1973.*

Plaintiffs do not attempt a frontal attack on the delegation of authority to CISC which was traced in Part I of this order and appears undeniable. Instead, they argue that it was never validly constituted, that having once approved the 1971–74 collective bargaining agreement it could not reconsider the wage increases provided therein, and that its renegotiation recommendation was beyond its authority.

1. *CISC was validly constituted.*

■ Plaintiffs contend briefly that CISC never really came into existence because "[t]here is simply no indication that [its members] were legitimately appointed." The court is unable to agree that summary judgment should be granted to plaintiffs on this ground. The existence of the CISC has been repeatedly affirmed. See Electrical Workers Local 11 v. Boldt, 481 F.2d 1392, 1394 (Em.App.1973); Plumbers Union Local 519 v. Construction Indus. Stabilization Comm., *supra*, 479 F.2d at 1054. Neither the Act nor any Executive Order sets out any precise scenario for appointments. CISC obviously functioned, had meetings and was recognized to have a full complement of members and alternate members, whose names could be obtained from its offices. It is not important what mode the President or the Secretary of Labor employed to appoint these individuals. Plaintiffs' argument is frivolous.

2. *The CISC had authority to reconsider this agreement in 1973.*

■ Plaintiffs energetically contend that since CISC's September 3, 1971, approval of their agreement was "final" CISC was without authority to review that approval at a later date. Defendants argue that the approval was not "final" because it was made subject to the provisions of Executive Order 11615. But that Order merely imposed a wage freeze for 90 days starting August 15, 1971, as plaintiffs point out, and that freeze could have no bearing on wage increases scheduled for 1973. The court accepts plaintiffs' characterization of the September 3, 1971, approval as final. It does not follow, however that CISC was without authority to reconsider that approval.

Plaintiffs' position relies basically upon their interpretation of the various Executive Orders and regulations issued under the Act. Thus, they point out that Executive Orders 11640 and 11695 ratified acts done under Executive Order 11615, which was in effect when the approval issued (but which did not endow CISC with authority to approve wage increases). They point also to certain regulations they claim indicate that CISC approval was required only as to future applications, e. g., 29 C.F.R. § 501.15(b); paragraph 6 of the 1973 Policies. They argue that Executive Order 11588 did not contemplate piecemeal review, and that sound policy should not countenance it. Finally, they urge that such reconsideration is beyond the power of the CISC under Executive Order 11627, but they do not explain why that Order so limited the CISC's power.

The problem with these arguments is that they disregard the deference this court must accord the agency's interpretation of the Act and the Orders. CISC's interpretation of Executive Order 11627 was that it required reconsideration of all agreements previously approved. As Dr. Mills explained in his January 4, 1974, explanation of reasons for the limitation of plaintiffs' wage increase,

the Committee commenced the review of all economic adjustments scheduled to take effect on or after August 16, 1971, contained in those agreements which had previously been approved (roughly 800 agreements), and contained in collective bargaining agree-

ments negotiated prior to the establishment of CISC on March 29, 1971 (roughly 3,000 agreements). It was generally the practice of the Committee to examine these economic adjustments one increment at a time, as they became due.

This interpretation of Executive Order 11627 was reasonable. Section 1 of that Order had frozen all wage increases until approved, implying that future approval was necessary. That Order had revoked section 6 of Executive Order 11588, which had provided the standards CISC had applied in approving the agreement in September, 1971, implying that a new review should be done under the new standards. The decision to review agreements increase-by-increase is reasonable. The Order required approval of wage increases, not contracts. See Plumbers Union Local 11 v. Construction Indus. Stabilization Comm., *supra*, 479 F.2d at 1054. This method of approval would permit CISC to take account of ongoing developments in fashioning a sensible policy while approval of a long-term agreement as a whole could work a hardship on the parties to the agreement if CISC's prediction about the success of the Program proved inaccurate. Most important, CISC's interpretation permitted equal across-the-board treatment for all segments of the economy. It was the only agency created under the Act before the President issued Executive Order 11615 so the only agreements that might be exempted from consideration under the economy-wide program inaugurated in Executive Order 11627 were those in the construction industry. Given the President's obviously paramount concern about inflation in that industry, it would be unreasonable for CISC to have concluded that he meant to tie its hands as to any agreement it had approved while at the same time revoking the criteria under which it had issued that approval.

3. *CISC acted within its authority in recommending renegotiation.*

In its June 18, 1973, letter to the National Carpenters' Craft Board, CISC stated that "[t]he parties are advised to renegotiate the agreement and submit it to the Craft Board for review and resubmission to the Committee." Finding this to be a "requirement" that they renegotiate the agreement, plaintiffs contend that it is "totally illegal." They rely upon Associated General Contractors of America v. Laborers' Int'l Union, 476 F.2d 1388 (Em.App.1973), for this conclusion. The argument has no merit. It is not clear that CISC's recommendation was a "requirement." The letter to the Craft Board was forwarded to plaintiffs with a cover letter that informed them they could seek further review of their case. Thus, it appears that CISC was merely suggesting a course of action the parties might consider as an alternative to seeking further review of the contract as written.

More important, the *Associated General Contractors* case does not support their position and is easily distinguishable. CISC had refused to approve the agreement there even though it contained a wage package increase of less than 5.5 percent. It had several objections to the agreement that were not related to the amount of the wages and fringe benefits provided therein. It felt, for example, that the pension fund and fringe benefits paid into it were too small, that the bargaining area was too small and that the international union, rather than the local, should do the bargaining. See 476 F.2d at 1400 n. 18. The trial court upheld CISC's action on the theory that "both the Craft Board and CISC are authorized to disapprove agreements and make recommendations with regard to bargaining subjects which go well beyond the limited area of wages." Gordon v. Laborers' Int'l Union, 351 F.Supp. 824, 835 (W.D.Okl. 1972).

The TECA reversed. It noted that the case presented "unique questions" because it involved CISC disapproval of an agreement partly on the ground that the economic adjustments were not large enough. 476 F.2d at 1390. It objected to the trial court's approach to the case because "[i]ts reasoning in upholding

the action of the Board and CISC was so broadly worded as to render these agencies virtual bargaining agents for the parties," *id.* at 1393, an approach that raised the danger of a jurisdictional conflict with the National Labor Relations Board. *Id.* at 1397 n. 8. Instead, the TECA concluded that CISC had been granted no authority to disapprove a contract on grounds unrelated to guarding against inflationary increases in wages and fringe benefits;[7] it could not "parlay its advisory and assistance functions virtually into bargaining authority." *Id.* at 1397. The court recognized, however, that CISC was empowered to disapprove wage packages that were in excess of its guidelines and that such a determination was entitled to great deference. *Id.* at 1400.

■ Here CISC's disapproval of a portion of the June 16, 1973, wage increase was premised solely upon its objection that the proposed wage package was too large and would have unsettling effects in the industry if approved. It made no attempt to meddle with other provisions of the agreement; certainly its objection was not that the increases should be larger. Thus, the great deference the court must apply generally to CISC's interpretation of its authority must be applied in this instance, and its action must be upheld because it seems an eminently reasonable interpretation of its rules. It had authority to disapprove increases it determined were excessive, but this authority was rather inflexible so it suggested to the parties that they propose some other arrangement that would meet its standards. It made no attempt to tell the parties what changes to make, but only kept the door open for reconsideration based upon a renegotiated agreement. It would have been unreasonable for CISC to refuse to reconsider a renegotiated agreement;

its indication that it was receptive to such renegotiation was not in excess of its authority.

B. *The Procedure CISC Employed.*

Plaintiffs contend that CISC violated its own regulations, the Administrative Procedure Act, the Economic Stabilization Act and the due process clause of the Fifth Amendment to the Constitution in denying them their full wage increase.

1. *CISC complied with its own regulations.*

■ Plaintiffs make two arguments directed toward showing that the procedure CISC employed violated its own rules and the requirements of the Executive Orders. First, they point to various provisions in the Orders and the regulations indicating that CISC and the Craft Boards were to act promptly upon applications for approval. See Executive Order 11695 § 5(a); Executive Order 11640 § 15(a); Executive Order 11627 § 14(a); Executive Order 11588 §§ 3(a); 4(a); 29 C.F.R. §§ 2001.-41(a); 2001.42(b). They argue additionally that these provisions should be interpreted strictly to achieve the purposes of the Act because deferred disapproval of wage increases can only have modest effects on the inflationary spiral, although it can hardly be said that approving wage increases is a more salutary means of containing inflation. The court is somewhat at sea in determining how to interpret the general admonitions to promptness upon which plaintiffs rely. It feels that the controlling principle on such matters is the proper regard it should have for the enormity of the task CISC was required to undertake. It had to review thousands of agreements. Like plaintiffs' many of them probably had several increases at intervals, thus multiplying the number of re-

---

7. Specifically, the court concluded that neither the President nor the Pay Board delegated to the agencies involved here any such general power to establish criteria different than those specified and hereinabove [dealing with fringe benefits that should be considered part of the wage package] discussed for disapproving pay increases within the standard of 5.5%. 476 F.2d at 1399.

views CISC had to do. In view of this workload, the court cannot accept plaintiffs' argument that there is some "absolute requirement" of prompt review that operates to exempt from review all those agreements CISC was unable to evaluate immediately. To accept plaintiffs' view would require haste in an effort that required deliberation.

Plaintiffs also rely upon CISC's rule that it would "not review wage and salary increases in a collective bargaining agreement if a work stoppage is in progress that involves wages and salaries contained in that agreement." 6 C.F.R. § 505.27(c). They claim CISC violated this rule, relying on their picketing activities in November, 1973, during the time CISC was considering their application for review of its initial determination that the scheduled wage increase was excessive. The problem with this argument is that it perverts the regulation, which was obviously intended to reduce the meddlesome effect of CISC review on relations of parties to a collective bargaining agreement when they were engaged in economic conflict with one another. In this case the true adversary against which the strikers were acting was not the employers, but CISC itself. Their only dispute with the employers was that they were obeying CISC (and the President) by withholding that portion of the negotiated increase that CISC had not approved. Surely CISC did not intend by this regulation to encourage aroused employees to use economic weapons against it, so it was reasonable for it to interpret the regulation not to apply to this situation. Moreover, after November 16, 1973, any strikers were acting in violation of either a temporary restraining order issued by Judge Wollenberg or a preliminary injunction issued by Judge Burke.

Since CISC's action took place in December, it appears that they rely upon their own contumacious disregard for the orders of this court to justify overturning CISC's decision. The court cannot accept this position and rejects their argument.

2. *CISC complied with the Administrative Procedure Act.*

■ Plaintiffs assert that they should be awarded summary judgment because CISC had violated the "absolute rule-making requirement of section 4(c) of the Administrative Procedure Act (APA), 5 U.S.C. § 553(d), that a substantive rule be published 30 days prior to its effective date.[8] They point to six instances in which they claim this requirement was not fulfilled: (1) CLC Order No. 16; (2) CLC Order No. 20; (3) CLC Order No. 213; (4) Pay Board Order No. 2; (5) Pay Board Order No. 2, as amended; (6) CISC's 1973 Guidelines. The core problem with this argument is that none of these promulgations is subject to the requirements of section 4(c).

■ The rule-making requirements of the APA apply only to substantive rules; the party complaining of an agency's failure to adhere to these requirements must show that the promulgations involved impose rights or obligations on some party. Plaintiffs have made no attempt to demonstrate how any of these items imposed rights or obligations on them. Texaco, Inc. v. Federal Power Comm'n, 412 F.2d 740, 744 (3 Cir. 1969). The first four were merely delegations of authority and cannot in any way be said to have imposed obligations on plaintiffs or anyone else. They merely authorized various agencies created by the President to administer the controls Congress and the President

---

8. Defendants also urge that the court reject plaintiffs' arguments under 5 U.S.C. § 553(b), but the court is unaware that plaintiffs presently rely upon those provisions in any of their challenges to CISC's action. It notes, however, that defendant's arguments on this score are persuasive. Additionally, it notes that the June 18, 1973, letter adequately informed plaintiffs of the reasons for CISC's determination that the full wage increase was unjustified as required by 5 U. S.C. § 553(e). See Plumbers Local 519 v. Construction Indus. Stabilization Comm., *supra,* 479 F.2d at 1055–56.

had themselves decided to impose on the economy. Arguably the last two items —which include CISC's "Substantive Policies"—have some of the attributes of substantive rules. But they imposed no obligations upon anyone. The requirement of approval by CISC or the Pay Board or the CLC (which delegated their tasks to CISC) was ultimately grounded upon the Executive Orders, whose nonpublication is not challenged here.[9] The policies themselves merely indicate the general guidelines to which CISC would look in administering that obligation. The situation here is therefore distinguishable from that which confronted the TECA in DeRieux v. The Five Smiths, Inc., 499 F.2d 1321 (1964), cert. denied, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974). Appellants there challenged Executive Order 11615 and the regulations promulgated thereunder imposing a 90-day freeze on wages and prices. This Order clearly imposed upon many people obligations that had not existed theretofore, and the Government had to justify its failure to publish them thirty days before their effective date. See id. at 1331–34.[10] No such situation is presented in this case and the publication requirement is inapplicable. Moreover, even were the "Substantive Policies" characterized as substantive rules, they would fall within the exception to the deferral requirement contained in 5 U.S.C. § 553(d)(2) because they were "interpretive rules and statements of policy."

It is additionally worth noting that plaintiffs were not, as they apparently claim they were, substantially prejudiced by the delayed publication or immediate effectiveness of the six items to which they refer. As to the first four, of course, they could claim no prejudice since these items merely delegated authority to CISC to administer the Program in the construction industry. As to the "Substantive Policies," there is no doubt that they were fully advised of the standards CISC would apply in time to prepare their factual presentation to conform to those standards. Paragraph 5 of the 1973 Policies, upon which CISC relied in denying plaintiffs the full wage increase they sought, was included in virtually the same form as in the 1973 Policies in the "Substantive Policies" of Pay Board Order No. 2 as amended and published on April 25, 1972, 37 Fed.Reg. 8110, nearly 16 months before plaintiffs' hearing. These standards were continued in effect by section 3(a) of Executive Order 11695. Plaintiffs could not have been prejudiced by CISC's failure to publish its 1973 Policies prior to the hearing since they were already aware of this standard. See United States v. Lieb, supra, 462 F.2d at 1166–67. Moreover, the President of plaintiffs' international union received a copy of the February 26, 1973, press release

9. Attempts to impose the provisions of the APA on Executive Orders raise difficult problems discussed in DeRieux v. The Five Smiths, Inc., 499 F.2d 1321, 1331–32 (Em. App. 1974), cert. denied, 419 U.S. 896, 95 S. Ct. 176, 42 L.Ed.2d 141 (1974).

10. Defendants rely on DeRieux for the proposition that deferred effectiveness is not required in this case under 5 U.S.C. § 553(d)(3), which exempts a rule from the requirement "for good cause found and published with the rule." In DeRieux the court indicated that in some extraordinary situations it would determine for itself whether good cause existed and, if it concluded there was good cause, it would exempt the regulation from the publication requirement although there was no statement of good cause published with the rule. In that case,

however, the court dealt with the wage and price freeze under Executive Order 11615 and found that there was good cause not to defer the effective date of the regulation for thirty days "based on facts so obvious that they may be judicially noticed." Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices." 499 F.2d at 1332. No similar facts appear in this case to justify a finding of good cause. The parties would not be expected to alter their conduct in such a way as to frustrate the purposes of the Program in response to announcement of the proposed "Substantive Policies." Indeed, the improbability of any change in conduct based upon the "Substantive Policies" underscores the fact that they did not impose any obligations on anybody that could stimulate evasive conduct.

containing the 1973 Policies, so plaintiffs apparently had actual notice of them. Plaintiffs themselves, through their counsel, inquired into the standards used to review the agreement during the period between the initial disapproval in June, 1973, and the hearing in August. In a letter dated August 7, Joe Russell, the Executive Director of CISC, informed them that CISC had determined that "to allow economic adjustments of 90 cents for the June 1973 contract year would cause an unstabilizing effect on other negotiations in the industry." Thus, CISC indicated, before the hearing that it was relying on paragraph 5 of its "Substantive Policies." While it is true that the publication requirements of section 4(c) of the APA are not designed primarily to avoid this sort of prejudice,[11] the court feels that the absence of any conceivable prejudice to plaintiffs as a result of the nonpublication of these six items further undermines their meritless legal arguments since they are seeking equitable relief.

3. *CISC complied with section 207(b) of the Act.*

On April 30, 1973, Congress added the St. Germain amendment to section 207(b) of the Act. This proviso required that any order reducing wages be made "on the record after opportunity for a hearing." Plaintiffs claim that CISC violated the St. Germain amendment at the time it sent the June 18, 1973, letter initially disapproving the 65

cent wage increase and when it issued its order in December of 1973.[12] First, they argue that although the June letter was not labeled "Order" it was, in effect, an order and that the St. Germain amendment therefore required that a hearing be afforded them before it issued. They contend that the meeting held in May, 1973, between their representatives and representatives of CISC was not such a hearing and that it dealt solely with the pension fund that depended upon the June 1, 1973, increase in fringe benefits. The problem with their argument is that the June 18 letter was not a final disposition of the matter. It was accompanied by a letter advising them that they were entitled to a hearing as required by the St. Germain amendment. Thus, while it precluded immediate payment of the unapproved portion of the wage increase, it merely postponed such payment should CISC ultimately determine that the full increase was justified. Such postponements do not invoke the hearing requirement of the St. Germain amendment. County of Nassau v. Cost of Living Council, 499 F.2d 1340, 1343 (Em.App. 1974).

Plaintiffs also contend that the August 17, 1973, hearing before Stuart Rothman did not satisfy the St. Germain amendment. This argument presents rather difficult problems of statutory interpretation because it is unclear what sort of hearing Congress had in mind when it enacted the proviso upon which

11. The requirement that the effective date of regulations be deferred to thirty days after they are published is premised upon fairness to those affected by the regulations: to permit interested persons to express their views before the regulations are put into effect. See Kelly v. United States Dep't of Interior, 339 F.Supp. 1095, 1101–02 (E.D. Cal.1972). Thus the court feels it is appropriate to advert to the fairness of nonpublication upon plaintiffs here in evaluating their arguments based upon this deferral procedure.

12. In response to the court's order for further briefing, plaintiffs filed a supplemental memorandum arguing that since CISC had no standards for reviewing proposed wage increases, its individual determinations were de facto rule-making and subject to the requirements of 5 U.S.C. §§ 556 and 557 via 5 U.S.C. § 553(c). This argument appears inconsistent with their argument about the publication procedure used for CISC's "Substantive Policies" because that argument depends upon demonstrating that the policies *were* substantive rules. Those policies, and the portions of the Act and the Executive Orders upon which they were based, did provide CISC with standards to apply to individual cases. The court therefore rejects plaintiffs' attempt to impose the hearing requirements for rule-making on CISC's adjudicatory function.

496

plaintiffs rely. Plaintiffs contend that Congress intended that the agencies provide a "full due process hearing." Since "[t]he typical federal statute says nothing about a determination on the record," 2 K. Davis, Administrative Law Treatise § 13.08 at 226 (1958), it appears that Congress does use the phrase as a term of art to signify that some sort of adversary process is required. See 5 U.S.C. § 553(c). But section 207(a) of the Act expressly exempts agencies created under the Act from the requirements of the APA except for 5 U.S.C. §§ 552, 553, 555(e). Plaintiffs' interpretation of the St. Germain amendment is basically that it mandates the full hearing procedure required by 5 U.S.C. §§ 554, 556, 557 despite the explicit exemption of economic stabilization agencies from those sections contained in section 207(a) of the Act.

■ CISC has not so interpreted the St. Germain amendment, and its interpretation of the Act is reasonable. Its interpretation is presumptively valid because it relies upon the "cardinal rule . . . that repeals by implication are not favored," Posadas v. National City Bank, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1935), in according to section 207(a) its full weight despite the subsequent amendment to section 207(b). Moreover, it appears to serve the purpose Congress had in mind in enacting the amendment. Congress was concerned that the agencies were reducing wages of persons without ever giving those persons an opportunity to attempt to justify their wage levels. CISC's procedure afforded affected parties just such an opportunity and was a reasonable effort to achieve the Congressional purpose. The court therefore will uphold it.

4. *Plaintiffs' right-to-hearing due process claims are substantial.*

■ Under section 211(g) of the Act the TECA has exclusive jurisdiction to determine the constitutional validity of any order issued under the Act. Thus this court should certify to the TECA any substantial constitutional issues raised by plaintiffs. A constitutional challenge is substantial unless already decided by the Supreme Court or obviously without merit. Delaware Valley Apartment House Owners Ass'n v. United States, 350 F.Supp. 1144, 1150 (E.D.Pa.1972), aff'd 482 F.2d 1400 (Em.App.1973). The court concludes that plaintiffs have raised procedural due process claims that are not obviously without merit. It is apparently conceded by defendants that the precise issues plaintiffs raise have not been decided by the Supreme Court.[13]

13. Plaintiffs properly distinguish Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), on several grounds. In that case the petitioners had been convicted of sale of beef at a price above that allowed by the price controls imposed under the Emergency Price Control Act of 1942, 56 Stat. 23. The Act had required that all challenges to orders issued under it be presented first for administrative review and then to an Emergency Court of Appeals. Based on its ruling in Lockerty v. Phillips, 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943), the Court held that the Act did not permit persons charged with disobedience of orders to raise the constitutional invalidity of the Act as a defense to prosecution. *Id.* 321 U.S. at 427–29, 64 S.Ct. 660. Stressing the emergency confronted by Congress, see *id.* at 422, 431–32, 64 S.Ct. 660, it held this procedure not to be unconstitutional on its face because "[s]uch a procedure, so long as it affords to those affected a reasonable opportunity to be heard and present evidence, does not offend against due process." *Id.* at 433, 64 S.Ct. at 671. But it was not asked to review the adequacy of any review actually done by the administrators:

In the absence of any proceeding before the Administrator we cannot assume that he would fail in the performance of any duty imposed on him by the Constitution and laws of the United States, or that he would deny due process to petitioners by "loading the record against them" or denying such hearing as the Constitution prescribes. [Citations omitted.] Only if we could say in advance of resort to the statutory procedure that it is incapable of affording due process to petitioners could we conclude that they have shown any legal excuse for their failure to resort to it or that their constitutional rights have been or will be infringed.

Plaintiffs view their due process claims as the central issue of this lawsuit. Their arguments are premised upon the "fundamental requirements of procedural due process." They rely upon the desirability of an adversary hearing in cases where a party will suffer a detriment as a result of official action. See, e. g., Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Goldberg v. Kelley, 397 U.S. 254, 90 S. Ct. 1011, 25 L.Ed.2d 287 (1970); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971), aff'd, 497 F.2d 809 (9th Cir. 1974). They attack both the preliminary determination that the full increase not be allowed in June, 1973, and the final order issued on December 7, 1973, confirming that only 15 cents of the proposed wage increase would be allowed. Certainly they have suffered a detriment as a result of these actions, see Fuentes v. Shevin, *supra,* 407 U.S. at 80–87, 92 S.Ct. 1983, and they claim that they were constitutionally entitled to an opportunity to rebut the evidence upon which CISC based its determination.

Defendants contend that plaintiffs have had as full an opportunity to a hearing as the Constitution requires. They point out that prior to the June determination representatives of plaintiffs met with representatives of CISC to discuss the proposed increases, although plaintiffs contend that only the increase in fringe benefits was discussed at that time. They rely heavily on the August 17, 1973, hearing before Stuart Rothman but concede that they made no affirmative showing at that hearing

that plaintiffs could rebut and that matters not introduced at that hearing were used in the decision-making process CISC used in considering the increases proposed in the agreements. Plaintiffs contend additionally that while they were permitted to inspect the data in the CISC files relating to their contract, they were unable to make sense of the contents of the files because the files were in such disorder. Under these circumstances their opportunity to present evidence was severely circumscribed by their inability to determine what evidence CISC would rely upon in reviewing their case.

■ While the court is mindful of the counterbalancing interests of the nation in efficient administration of the Economic Stabilization Program and the bona fide attempt by CISC to permit plaintiffs to make their views known, the court cannot conclude that plaintiffs' right-to-hearing arguments are without merit. It therefore must defer to the judgment of the TECA and certify this issue to the appellate court.

■ Plaintiffs make another procedural due process argument that is obviously without merit. They contend that they were denied due process of law because representatives of national associations of contractors voted on their proposed wage increases. They reason that these members of CISC were interested parties who should have disqualified themselves because of their interest. Defendants respond by pointing out that Executive Order 11588 clearly contemplates that the membership of CISC be tripartite—with representatives of la-

*Id.* at 434–35, 64 S.Ct. at 672.
The situation presented in this case is substantially different. While the nation may be confronting an "emergency" brought on by the wage-price spiral, it is not an emergency of the character that confronted the nation when it was plunged into World War II, so equally stringent measures may not be called for. Plaintiffs here have availed themselves of the administrative review to the maximum extent possible and ask the court to evaluate the treatment actually ac-

corded them, not to entertain their speculations about the adequacy of the administrative procedures in the abstract. Thus *Yakus* is sufficiently distinguishable for the court to conclude that the Supreme Court has not decided the issues presented in this case. Moreover, the court entertains some doubts about the effect of recent right-to-hearing decisions by the Supreme Court on the continued vitality of *Yakus'* thirty-year old sanction of the procedure employed by the Act then before the court.

bor, management and the public—and that such tripartite boards are a traditional method of administering such regulatory efforts as the Program here involved. Moreover, Congress specifically exempted the members of agencies created under the Act from the conflict of interest provisions of 18 U.S.C. §§ 203, 205, 207, 208; and 209 in section 204(2) of the Act. The TECA has recognized the importance of the experience of the members of CISC. See United States v. Electrical Workers Local 11, *supra,* 475 F.2d at 1209; Plumbers Union Local 519 v. Construction Industry Stabilization Committee, *supra,* 479 F.2d at 1056. Plaintiffs seek to reinstate the conflict of interest principles Congress specifically eliminated from the Program via the due process clause of the Fifth Amendment. They cite no support for their position and the court is aware of none. Their position is anomalous in that the President of plaintiffs' international union, William Sidell, was an alternate member of CISC, was present at all deliberations of their case and, in fact, voted in their favor when their appeal was considered on January 31, 1974. Plaintiffs' conflict of interest constitutional argument is obviously without merit.

### C. *Challenges Going to the Substance of CISC's Action*

1. *CISC did not violate its own rules in attempting to maintain the historic relation between crafts.*

 Plaintiffs concede that maintaining the historic relation between crafts is a proper standard by which CISC may measure the propriety of a given wage increase. The TECA has declared such an attempt inherently rational. Electrical Workers Local 11 v. Boldt, *supra,* 481 F.2d at 1394–95. Nevertheless, plaintiffs challenge CISC's action here as violative of the "mandatory prerequisite" provided in its rules that "[i]n general, any restoration to appropriate historical relationship among crafts or localities should be spread over a period of two or three years." See 37 Fed.Reg. 8141. It is apparent that this regulation is not a "mandatory prerequisite," and that CISC did not interpret it unreasonably in its handling of plaintiffs' case. CISC did not attempt fully to redress the deviation it felt had developed from the traditional wage relationship among various crafts or areas in the construction industry in California, but only to go part of the way and reduce the differential. Its attempt to do so was clearly reasonable and plaintiffs' argument is frivolous.

2. *CISC's determination is supported by substantial evidence.*

 Plaintiffs argue that there is no substantial evidence to support CISC's determination. They misapprehend the role of the court in reviewing agency action under the Act. Thus, they emphasize language in Plumbers Local 519 v. Construction Industry Stabilization Committee, *supra,* 479 F.2d at 1055, to the effect that the Government has the burden of proof that a wage increase is inconsistent with the Program and the statement in CISC's rules that a "clear showing" of inequity must be made to justify disallowing a proposed wage increase.[14] Despite these general admonitions, the court's review is limited by section 211(d)(1) of the Act to determining whether CISC's conclusion

---

14. Plaintiffs find in this requirement a broad requirement that seems to the court entirely inconsistent with the purposes of the Program. They argue that

[t]he purpose of this requirement is based upon the fundamental principle that it is unfair to reduce carpenters' wages because the wages of other working people may be lower. The burden should be on the employers to raise the wages of those other working people whose wages have fallen behind the others.

The court is unaware of any support for this extraordinary proposition, and plaintiffs cite none. Certainly it cannot be derived from the Act, any Executive Order issued under it or any of the regulations issued by agencies created under the Program. Indeed, it seems anathema to any effort to control the spiralling increase of wages and prices.

is supported by substantial evidence. In making this review, the court must give great deference to CISC's factual determinations and to its interpretation of the standards it was authorized to apply. To prevail, plaintiffs must demonstrate that CISC acted in an "arbitrary or capricious manner." Pacific Coast Meat Jobbers Ass'n v. Cost of Living Council, *supra*, 481 F.2d at 1391.

Adhering to this limited review, the court rejects each of plaintiff's three specific challenges to the substantiality of the evidence upon which CISC based its determination. First, they argue that CISC had no data at all upon which to base its decision because the charts and other materials ultimately submitted in support of the December, 1973, order had been prepared after the initial determination in June. But they disregard the manner in which CISC conducts its business. It keeps the data upon which it relies on computer listings that are continuously updated—called "city sheets" and "master cards"—and cannot be faulted for using its latest data in support of the December decision.

Second, plaintiffs argue that there is no evidence of any inflationary impact from the 65 cent wage increase. It is true that CISC cannot prove that to allow this increase will in fact cause the cost of living to rise, or the value of the dollar to decline. Yet plaintiffs would have the court disregard the underlying rationale of the Program—that limiting wage and price increases will curb inflation—under the guise of reviewing for substantial evidence. The determination whether these regulatory tools will serve their purpose is one for Congress, not the court; the court need only determine whether there is substantial evidence to support application of this tool in this case on the theory relied upon by the agency.

Third, plaintiffs contend that the decision is without support because all the other crafts CISC referred to in its explanation had contracts extending beyond April 30, 1974, the terminal date of the Program. Thus, they reason, to permit them their whole increase would not encourage "leapfrogging" during the time the Program was in effect. They conclude that CISC was without power to consider any effects after April 30, 1974. Plaintiffs have not demonstrated, of course, that all agreements in the construction industry in California extended beyond April 30, 1974, or that none of those that on their faces would not expire before that time might not be renegotiated. Hence, even accepting their quasi-jurisdictional argument about CISC's reasoning, the court would be unable to conclude that CISC's action was arbitrary or capricious. But the court cannot accept that CISC was compelled to close its eyes to what might occur after it had ceased to exist because to limit its power in that fashion seems inherently inconsistent with the whole pattern of the Program. The Program had, by the time CISC denied plaintiffs their full increase, reached its third phase, and obviously was bound for other phases. It was evolving gradually to a time when no further controls would be imposed upon collective bargaining agreements, and was designed to achieve this transformation smoothly. If the agencies created under the Act could not take account of what would happen after the Program ended, its primary purpose —restoring to the economy the stability required to permit it to develop in an orderly fashion without controls—would be defeated because the termination of the Program could be expected to throw the economy into chaos. Certainly CISC's attempt only partially to remedy what it perceived as the distortion of wage levels between crafts demonstrates that it contemplated further orderly developments after it ceased to exist. Since the court must give great deference to its interpretation of the statutes and Orders endowing it with the authority it exercised, and since its attention to longer-range developments seems eminently reasonable, the court must reject plaintiffs' third attack on the substan-

tiality of the evidence in support of limiting the wage increase in plaintiffs' agreement.

More generally, the court is persuaded that CISC did have a substantial basis in fact for concluding that allowing the full increase "would cause unstabilizing effects on other negotiations in the industry." As its statement of explanation details, CISC had before it data on the wages in the construction industry in California over the period 1960–73 and on the rise in the Consumer Price Index over that period. It determined that the wages in the industry had risen much more dramatically than had the cost of living and that the wages paid workers in various crafts had also diverged remarkably. These were reasonable conclusions and were supported by evidence that was before CISC and is now before this court. Pursuant to the authority conferred upon it by Congress, the President and the CLC, CISC evolved a coherent plan to reign in the runaway increase in wages in the industry and restore order among the various trades therein. It may be that some of its decisions appear unwise in the light of hindsight. It may be that the Program as a whole and in the construction industry was largely a failure. But it is abundantly clear from the record in this case that CISC did not act arbitrarily or capriciously when it approved a wage increase of only 15 cents for plaintiffs.

3. *Plaintiffs' equal protection argument is not substantial.*

▇▇▇ Plaintiffs argue that limitation of increases in their wages is unconstitutional because CISC did not require contractors to reduce their prices at the same time it lowered wages, thereby reducing the contractors' costs. Since the contractors reaped windfall profits as a result of the Program, they reason, they have been denied due process. Insofar as the court understands this argument, it relies on the concepts of equal protection that are implicit in the due process clause of the Fifth Amendment, see Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). It is not substantial because it is obviously without merit.

In the first place, as defendants have demonstrated in their memoranda and exhibits, they *did* make some effort to avoid windfall profits by publicizing the cases in which they refused workers wage increases and keeping some track of the prices charged by contractors. It is true that CISC did not have a comprehensive scheme to limit profits by contractors. But it was not empowered to review such profits. If this court is to give due attention to the magnitude of the task confronting these administrators, it must credit this good faith effort to pass on the effects of its limitations on wages to the consuming public.

▇▇▇ More important, plaintiffs' argument misconceives the nature of equal protection. A person can mount an equal protection challenge only on the ground that the Government has chosen to treat differently persons who are similarly situated. As the TECA has indicated, employees and employers are not so similarly situated that differences in treatment accorded them are prohibited by equal protection. See Electrical Workers Local 11 v. Boldt, *supra,* 481 F.2d at 1395. Such classifications "must be upheld if the court can perceive any rational basis for the distinctions which they draw." *Id.*; see Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Thus, Congress could constitutionally have determined that wage controls would be a more efficient way to combat inflation than attempting also to reduce the prices charged by employers.[15] The

---

15. *Cf.* Amalgamated Meat Cutters & Butcher Workers v. Connally, *supra,* 337 F.Supp. at 758:

The law does not contemplate what is manifestly impracticable, or suppose that all problems are to be taken care of at

wisdom of such a decision, were Congress to make it, would not be a matter for the court to disapprove. Plaintiffs' argument is clearly without merit and need not be certified to the TECA.

### Conclusion

Having carefully considered the arguments made by both plaintiffs and defendants, the court is somewhat uncertain how to dispose of their cross-motions for summary judgment. Clearly under section 211(g) of the Act, it may not grant plaintiffs the relief they pray on constitutional grounds. Under section 211(c) it should certify to the TECA any substantial constitutional challenges to the Program it determines to exist. The court has determined that plaintiffs have raised one such substantial claim. The problem it confronts is how to give effect to its resolution of the other claims plaintiffs have raised, all of which it has rejected. Other district courts have had difficulty coping with the certification requirement of section 211(c). In National Petroleum Refiners Ass'n v. Dunlop, 486 F.2d 1388 (Em.App.1973), for example, the district court determined that there was a substantial issue and thereupon certified the case to the TECA. The TECA observed initially

> that the trial court has incorrectly certified the *entire case* to this court. Section 211(c) states that when the trial court "determines that a substantial constitutional issue exists, the court shall certify *such issue* to the Temporary Emergency Court of Appeals." (Emphasis supplied.) The appeals court may then, in its discretion, direct that the "entire action be sent to it for consideration," or it may

once. And so it has been held that broad emergency price control measures need not entitle each particular seller to consideration of the equity of his position, for

treat the certified issues and remand the case for further disposition below. *Id.* at 1389.

It remains unclear, however, whether the trial court ought first dispose of the nonconstitutional claims before certifying the substantial constitutional ones to the TECA. Given the normal rule that a court will only reach a constitutional issue if no nonconstitutional basis for decision is available, it would seem that the trial court should address all nonconstitutional issues raised before, or at least in addition to, certifying the constitutional ones to the TECA. Since, under section 211(b)(2), all appeals from district court decisions lie in the TECA, the difference in practice seems mainly a matter of timing. In the interests of judicial economy, and because its review of the constitutional claims substantially required the court to evaluate the nonconstitutional claims, the court has attempted to decide all the other issues presented by this complex case. Only the right-to-hearing constitutional claim remains, and the court must certify that claim to the TECA. Since this issue remains, however, the court may not grant or deny the motions for summary judgment.

It is therefore ordered that plaintiffs' claim that they were unconstitutionally denied the hearing to which the due process clause of the Fifth Amendment entitles them is hereby certified to the Temporary Emergency Court of Appeals under section 211(c) of the Economic Stabilization Act of 1970.

It is further ordered that resolution of defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment is stayed pending resolution of the constitutional issue certified to the Temporary Emergency Court of Appeals.

such an obligation would impose an administrative impracticability that would defeat the very purpose of the Act.